**Freddie HESTER, et al., Plaintiffs,**

v.

**CITY OF MILLEDGEVILLE, et al., Defendants.**

**Johnnie JOHNSON, et al., Plaintiffs,**

v.

**CITY OF ALBANY, et al., Defendants.**

**Civ. A. Nos. 84–84–3–MAC, 1200–ALB.**

United States District Court,
M.D. Georgia,
Macon and Albany Divisions.

Dec. 11, 1984.

Jerry Boykin, Warner Robins, Ga., C.B. King, Albany, Ga., for plaintiffs.

Charles A. Mathis, Jr., Milledgeville, Ga., James V. Davis, Albany, Ga., for defendants.

OWENS, Chief Judge:

Plaintiffs in Civil Action No. 84–84–3–MAC are fire fighters employed by the City of Milledgeville, Georgia Fire Department and in Civil Action No. 1200–ALB are police officers employed by the City of Albany, Georgia Police Department.[1] In each action plaintiffs are the subjects of internal investigations into suspected illegal drug use and/or sales by departmental employees. As a part of these investigations each governmental employer has announced that it intends to require plaintiffs to submit, *inter alia*,[2] to a polygraph examination, the results of which will be used to determine whether disciplinary action will be taken. Defendants have further advised that a refusal to submit to a polygraph examination shall be grounds for disciplinary action. Plaintiffs have moved this court to enjoin the defendants from utilizing polygraph examinations in these investigations. Plaintiffs allege that their constitutionally protected property right in continued public employment cannot be taken on the basis of the results of a polygraph examination—an unreliable method of detecting truth or deception—or upon their refusal to submit to this unfair procedure. Defendants vigorously deny plaintiffs' contentions, suggest that a polygraph examination is a constitutionally permissible means of investigating governmental employee misconduct, and request this court to deny the injunctive relief[3] requested by plaintiffs.

On February 8 and 10, 1984, this court heard evidence surrounding the pending investigations and the defendants' intent to administer and rely upon polygraph examination results. Two licensed polygraph examiners, whose services the defendants either have used or intend to use in these investigations, also testified. On April 26, 1984, the parties presented expert testimony on the validity and reliability of polygraph testing. The defendants' expert, Dr. Frank S. Horvath, a psychophysiologist and professor of criminal justice at Michigan State University, testified in support of polygraph validity. The plaintiffs' expert, Dr. Benjamin Klienmuntz, a clinical psychologist and professor of psychology at

1. The plaintiff police officers in No. 1200–ALB are black. Apart from their attack on the polygraph on procedural due process grounds, they also allege that the internal investigation is being conducted in a racially discriminatory manner. Therefore, rather than filing a new civil action in the Albany Division of this court (currently presided over by the Honorable J. Robert Elliott), they elected to invoke this court's continuing jurisdiction of the 1976 permanent injunction issued in the case of *Johnson v. City of Albany*, 413 F.Supp. 782 (M.D.Ga.1976) (Civil Action No. 1200–ALB), in which this district judge enjoined various practices of racial discrimination. The defendant City of Albany argues that no evidence of racial discrimination has been offered in the instant action, and, therefore, the *Johnson* injunction is an improper vehicle by which to bring this action. Therefore, defendant argues, jurisdiction and venue are improper, and plaintiffs' action should either be dismissed or transferred to the Albany Division of this court pursuant to 28 U.S.C.A. § 1404(a) (West 1976).

   Section 1393(a) of the Judicial Code provides:
   (a) Except as otherwise provided, any civil action, not of a local nature, against a single defendant in a district containing more than one division must be brought in the division where he resides.
   28 U.S.C.A. § 1393(a) (West 1976). Because of this court's ultimate decision in these actions, the court finds it unnecessary to address plaintiffs' claim of racial discrimination. The evidence shows, however, that this claim was brought in apparent good faith, and that it was sufficient to invoke this court's jurisdiction under the injunction issued in *Johnson*. Defendants' claim that this court lacks jurisdiction and venue over this case is without merit.

2. The defendants in both actions also have required plaintiffs to submit to urinalysis testing procedures. Although plaintiffs to some extent have challenged the reliability of urinalysis, the court is not pursuaded that use of such testing procedures will violate plaintiffs constitutional rights. Accordingly, the court hereby DENIES plaintiffs' request for injunctive relief with respect to the use of urinalysis testing procedures.

3. Upon the filing of each complaint defendants agreed not to utilize polygraph examinations until such time as this case is finally decided, making it unnecessary to consider plaintiffs' prayer for preliminary injunctive relief.

the University of Illinois at Chicago, interpreted and testified about various scientific studies reporting significant error rates in polygraph testing. The court received either summaries or complete reproductions of virtually every scientific assessment of polygraph validity conducted in the last twenty years. The parties and *amicus curiae* American Civil Liberties Union have thoroughly briefed the constitutional issues underlying plaintiffs' claim for injunctive relief.

*Findings of Fact*

*Hester v. City of Milledgeville*

1. As early as March of 1982, a City of Milledgeville Fire Department employee was caught smoking marijuana in the restroom of Fire Station Number 1. Additionally, a city police officer reported drug paraphernalia being thrown from a city fire truck, and a subsequent search of the vehicle revealed the presence of marijuana residue. Record at 36–37 (Hearing of February 8, 1984). The City of Milledgeville Police Department was also under investigation for alleged illegal drug use by city police officers.

2. The Chief of the Fire Department issued a memorandum, dated March 12, 1982, which provided in pertinent part:

3) The use of drugs at the Milledgeville Fire Department must and will stop! In order to insure that this will happen, the following actions will be taken:

\* \* \* \* \* \*

b) In the future, the Chief may request any Milledgeville Firefighter to submit to a polygraph test; and

c) Refusal to take the test as requested by the Chief shall be grounds for disciplinary action.

Defendants' Exhibit 2.

3. Agents from the Georgia Bureau of Investigation were called in to continue the investigation of illegal drug use within the police department. During the course of this investigation additional information of illegal drug use by fire department personnel was developed. By November of 1983,

the Chief of the Fire Department was of the opinion that illegal drug use by fire department personnel had become widespread. Chief Pounds testified that in his opinion 60% of the thirty-one fire department employees had used illegal drugs either on or off duty, and 20%–25% had consumed illegal drugs while on duty. Record at 44–46, 50 (Hearing of Feb. 8, 1984).

4. The Mayor and Aldermen of the City of Milledgeville, on November 22, 1983, promulgated the following resolution and amendment to the Personnel Policies and Procedures of the City of Milledgeville:

USE OF POLYGRAPH EXAMINATIONS DURING INTERNAL INVESTIGATIONS INTO THE DEPARTMENT OR ACTIONS OR CONDUCT OF OFFICERS OR EMPLOYEES

Upon the order or directive of the Chief of the Milledgeville Police or Fire Department, the Mayor of the City of Milledgeville, the Chairman of the Public Safety Committee, or the Public Safety Director, sworn or unsworn employees and personnel of the Milledgeville Police and Fire Departments, shall submit to polygraph examinations. Polygraph examinations as required by this rule shall be specifically directed and narrowly related to a particular internal investigation being conducted by the Department or at the request of the Department. The refusal of any employee to submit to a polygraph examination after being ordered to do so, as provided above, shall be grounds for disciplinary action against the employee, including but not limited to termination. The refusal of any employee to sign documents necessary for the administration of a polygraph examination, *including the refusal to sign a waiver* shall be considered to be and the same shall constitute a refusal to take the polygraph examination. Any and all polygraph examinations administered pursuant to this policy shall be given by a polygraph examiner licensed to administer such examinations under the laws of the State of Georgia.

However, in no event shall the results of an employee [sic] on a polygraph examination be used as the sole basis for taking of disciplinary action against any employee.

Defendants' Exhibit 1 (emphasis added).[4] On November 29, 1983, *all* employees of the City of Milledgeville Fire Department were advised that they would be required to take a polygraph examination pursuant to the resolution of November 22, 1983. Record at 4, 8 (Hearing of Feb. 8, 1984).

5. Prior to this lawsuit nine polygraph examinations [5] were actually administered to fire department employees. As a result of these nine examinations one fireman admitted criminal conduct; the examiner reported two other individuals as deceptive. *Id.* at 77. To date neither of these individuals has been disciplined. *Id.* at 50–51.

6. Prior to the administration of the polygraph examinations the subjects of these tests were presented with four alternative "waiver forms." *See* Defendants' Exhibits 5, 10, 11, and 12. All nine fire fighters executed form 11 (Record at 79 (Hearing of Feb. 8, 1984)), which provides:

### UNDERSTANDING AND RELEASE

I understand that I am being directed by the Georgia Department of _____ to submit to a polygraph examination as part of an internal investigative procedure.

I understand that I am not required to waive any right guaranteed to me by the Constitution of the United States or the Constitution of the State of Georgia or any other law (including my right against self-incrimination under the Fifth Amendment to the United States Constitution). I further understand that I may object to answering any question asked by the examiner if such answer would tend to incriminate me or to otherwise expose me to possible criminal prosecution.

I hereby release the polygraph examiner administering this examination and the Georgia Bureau of Investigation, its agents, officers and employees from any liability resulting from the administration of this polygraph examination.

SIGNED _____

DATE _____

WITNESS _____

Defendants' Exhibit 11. In substance, the other optional forms submitted by the

4. In support of the defendants' intent not to take disciplinary action solely upon the results of a polygraph examination, defendant offered the testimony of the City Public Safety Director, who testified that three police department employees have not been disciplined despite a polygraph examiner's report that the three officers were deceptive when they denied use of illegal drugs. Record at 58–62 (Hearing of Feb. 8, 1984). According to the Public Safety Director, no disciplinary action was taken because no independent evidence of wrongdoing existed. *Id.* What is and is not "independent evidence of wrongdoing" is a matter of opinion—sworn testimony? a reliable informant? an anonymous tip? hearsay? direct evidence? While the written results of these polygraph examinations are not retained in the three officers' personnel files, the officers' superiors know those results and will remember those results if and when "independent evidence of wrongdoing" is obtained or if and when personnel decisions are being made.

5. Following a pre-test interview, the details of which are unknown, the following questions were propounded to each employee during the course of the polygraph examination:
1. Is your last name _____?
2. Are you more than twenty-one years old?
3. Did you in any way purposely lie on your statement about this incident?
4. Are you now in Georgia?
5. While employed with the Milledgeville Fire Department, have you used illegal drugs on duty?
6. While employed as an officer with the State of Georgia, did you do anything that if discovered, would have resulted in your dismissal?
7. Is today Friday?
8. Have you brought any illegal drugs on Fire Department property?
9. Have you dealt in illegal drugs on Fire Department property?
10. While employed as an officer with the State of Georgia, did you do anything that if discovered, would have discredited your badge?
Record at 82–83 (Hearing of Feb. 8, 1984).

G.B.I. provide as follows: Exhibit 5 allows the employee to stipulate that the results of the polygraph examination will be admissible as evidence in any administrative or judicial proceeding; Exhibit 10 allows an employee both to stipulate that the results will be admissible and to waive his right against self-incrimination; Exhibit 12 is a refusal form which acknowledges that all of the employee's options and the consequences of his choice have been explained prior to his refusal to submit to a polygraph examination. At the time these waiver forms were presented and executed, no employee was provided a list of questions to be asked, as the examination questions had not been prepared at that time. Record at 29 (Hearing of Feb. 8, 1984).

7. Plaintiff Freddie Hester has been employed as a fire fighter with the City of Milledgeville Fire Department since April of 1980. Under the City of Milledgeville Personnel Policies and Procedures Manual, Court's Exhibit 2, plaintiff Hester, as well as all other named plaintiffs, are "permanent" employees who can be terminated only for "cause" and are entitled to written notice and a post-termination hearing and appeal. Court's Exhibit 2 at 25–28, 31–33. Plaintiff Hester has previously taken two polygraph examinations involving unrelated matters. Each time he was advised by the examiner that he had been deceptive when, according to plaintiff, he had not been untruthful or deceptive. Record at 9 (Hearing of Feb. 8, 1984). Because of these experiences plaintiff Hester does not believe that polygraph testing produces a valid result.

*Johnson v. City of Albany*

8. In the fall of 1983, a confidential informant told the City of Albany Police Department of the unlawful use and/or sales of controlled substances by City police officers. Information was also received concerning the bribery of certain officers for information about pending drug investigations. A criminal investigation—in which polygraph examinations were not involved—led to the indictment of two City police officers on drug charges. Record at 2–3 (Hearing of Feb. 1, 1984).

9. The criminal investigations caused the Chief of Police to suspect thirteen additional police officers of participation in similar illegal drug activities. One of these individuals voluntarily submitted to polygraph and urinalysis testing, and was thereby cleared of suspicion. Another officer, upon being asked to submit to such testing procedures, resigned. Record at 4 (Hearing of Feb. 10, 1984). Eleven officers remain under suspicion.

10. The Chief of Police intends to request each of the eleven to take a polygraph examination. If an officer refuses, the Chief intends to order the individual to submit to the examination; a further refusal will result in suspension or termination. Record at 19, 23–25 (Hearing of Feb. 10, 1984).

11. The Chief of Police testified that disciplinary action will not be taken solely upon the results of a polygraph examination. Record at 20 (Hearing of Feb. 10, 1984). Polygraph testing will serve only as a supplement to the overall internal investigation. Record at 19 (Hearing of Feb. 10, 1984). In the absence of independent evidence, any employee reported deceptive on a polygraph examination will not be disciplined; however, as the Chief also testified, the deceptive result will be remembered and taken into consideration in future personnel decisions. Record at 35, 37 (Hearing of Feb. 10, 1984).

12. In order to avoid any claim of impropriety, the Chief intends to utilize a private polygrapher rather than the department's own, in-house examiner. Record at 28–29 (Hearing of Feb. 10, 1984).

13. The Chief of Police proposes to confer "use" immunity upon each officer who submits to a polygraph examination. Counsel for defendant City of Albany represents that a form containing the following language will be provided to the subject of each examination:

MEMORANDUM

TO:

FROM: [Norman E. Denney, Chief of Police]

Re: Polygraph Examination

Our Department is presently conducting an internal investigation. As part of that investigation you are hereby ordered to submit to a polygraph examination. This polygraph examination will be used only in connection with an internal investigation and any disciplinary proceedings which ensure [sic], and will not be used in any criminal prosecution. Any disciplinary action will not be based on the polygraph test alone. Questions will be asked only with respect to your conduct in the matter under investigation.

Your polygraph examination will be administered on _____ 198__ at _____. At that time you should report to the following location.

If you fail to report for your examination, refuse to take your examination or otherwise fail to cooperate with this investigation, you will be subjected to adverse action (probably dismissal).

If you have any questions, please contact the author of this memorandum whose telephone number is _____.

Court's Exhibit 4. The source of the authority to confer use immunity has not been provided to this court.

14. All of the plaintiffs in Civil Action No. 1200–ALB have a vested property interest in their continued employment with the City of Albany. Plaintiffs can be terminated only for "cause," and are entitled to notice, a pre-termination hearing, and a right of appeal. Brief of the Defendant City of Albany at 20; Court's Exhibit 3.

*The Polygraph*

15. A polygraph is a device or instrument which monitors and records physiological changes. It is not a "lie detector!" No device known to man can "read" an individual's mind and indicate whether that person is lying. A polygraph instrument is used by an examiner to form and render a personal, subjective opinion of truthfulness or deceptiveness based upon the examiner's observation of the subject and interpretation of physiological changes recorded by the polygraph instrument during interrogation. Record at 123 (Hearing of Feb. 8, 1984); 10, 30–31 (Hearing of April 26, 1984).

16. A typical polygraph instrument combines three devices which monitor breathing, blood pressure and galvanic skin response, and records changes in these conditions on a single chart or graph. The first device, a pneumograph tube, is placed around the subject's abdominal or thoracic area. This device monitors the amplitude, depth, and rate of breathing. The second device, an occluding plethysmograph or blood pressure cuff, which is placed on the subject's upper arm, monitors changes in blood volume, plus the amplitude and rate of heart beat. The third device consists of two electrodes placed on the subject's fingertips. A small current is generated, and changes in the skin's resistance to this current are monitored. Proponents of polygraph testing believe that changes in temperature and sweat secretions alter skin resistance. The measurement of these changes is known as galvanic skin response. These three physiological conditions are continuously and simultaneously recorded on a single chart during interrogation. Record at 7–8 (Hearing of April 26, 1984).

17. Two assumptions underlie the theory of polygraphic detection of deception. First, it is assumed that most humans experience physiological, stress-like symptoms when responding in a wilfully deceptive manner to interrogation. It is suggested that when a person consciously lies, the brain, because of fear or anxiety, causes increased levels of adrenalin to be released into the bloodstream, causing an increase in pulse rate, changes in breathing amplitude and rate, and increases in skin temperature and sweat secretions. Second, it is assumed that a polygraph examiner can observe and distinguish between physiological reactions that are caused by deception and physiological reactions that are caused by stress of interrogation unrelated to de-

ception. Record at 48 (Hearing of Feb. 10, 1984). Since it is conceded by all experts that there is no specific pattern of physiological responses associated only with deception, Record at 30, 155 (Hearing of April 26, 1984), the validity of the second assumption cannot be accepted.

18. Originally, the "Relevant/Irrelevant" technique of polygraphic interrogation was used by most examiners. A relevant question is a question requiring the subject to admit or deny, in "yes" or "no" fashion, the wrongdoing under investigation. One or more relevant questions are interspersed among several irrelevant, unprovocative questions. Polygraphers maintained that if a subject exhibited a perceptible physiological reaction to a relevant question, as opposed to the subject's reactions to irrelevant questions, then such a reaction was indicative of deception. A reaction to a relevant question could be caused by something other than deception, such as the subject's fear of being falsely accused or terminated from employment, or the subject's anger from being suspected and questioned at all. Record at 14–15 (Hearing of April 26, 1984); 120 (Hearing of Feb. 8, 1984).

19. In order to eliminate this ambiguity, the "Control Question" technique was developed. It is the most common form of polygraph examination in use today, and is the technique all defendants intend to utilize.[6] The control question technique combines irrelevant, relevant, and one or more control questions. A control question is a question that concerns wrongdoing *unrelated* to the matter under investigation. It is phrased in such a way that, arguably, no one could truthfully deny having ever participated in such wrongdoing. Record at 88 (Hearing of Feb. 8, 1984); 53 (Hearing of Feb. 10, 1984); 16–17 (Hearing of April 26, 1984). Typical control questions would be: "In the first twenty-one years of your life, did you ever steal anything of value?", or "During the first twenty-one years of your life, have you ever lied to any authority or have you ever lied to anyone who trusted you?" Record at 111 (Hearing of Feb. 8, 1984); 56 (Hearing of Feb. 10, 1984). It is assumed that every subject will either lie in response to a control question, or will be noticeably concerned about his answer. Record at 18 (Hearing of April 26, 1984). It is further assumed that a subject actually innocent of the matter under investigation will respond more noticeably to the control questions than to the relevant questions, and that one guilty of the matter under investigation will react more noticeably to the relevant questions than to the control questions. Record at 19 (Hearing of April 26, 1984); 89 (Hearing of Feb. 8, 1984).

20. Prior to monitoring a subject's physiological responses on the polygraph instrument, a polygraph operator conducts a pre-test interview with the subject. During this interview, the actual questions to be asked during the examination are discussed and reviewed, and the subject is instructed to answer each "yes" or "no," without explanation. The examiner may or may not allow the subject to clarify his answer so as to alleviate any doubt or concern. Additionally, the nature of the examination is discussed so that the examiner can determine if any unusual emotional condition, such as anger, is present. Finally, the examiner inquires about the sub-

---

**6.** The "Guilty Knowledge Test" is a type of polygraph examination completely distinct from the control question method. The guilty knowledge test is available only where the investigators and the polygraph examiner are aware of a fact or detail of a crime that only the true perpetrator would be in a position to know. Consequently, it is not suitable for most investigations. The theory underlying the guilty knowledge test is that an innocent subject should have no reason to attach any significance to the apparently innocuous detail; a subject who does react when this innocuous detail is discussed is therefore presumed guilty. A physiological reaction under these circumstances is arguably much less ambiguous than a reaction to a relevant question in the control question method. While the theoretical basis for the guilty knowledge test seems more plausible, it is not a method that defendants intend to use or that is possibly applicable to plaintiffs. This court will therefore not consider the possible validity of this procedure.

ject's medical and psychiatric history in order to determine if any condition is present that could distort the subject's physiological responses. Record at 27 (Hearing of April 26, 1984). As Dr. Horvath testified, the pre-test interview, and the examiner's thoroughness in conducting it, is the most critical portion of a polygraph examination. Record at 27 (Hearing of April 26, 1984). In spite of the significant role of pre-test interviews, they are seldom transcribed or recorded. Record at 143 (Hearing of April 26, 1984).

21. Numerous scientific studies have been undertaken to assess the validity of polygraph testing using the control question technique. A common problem encountered in such studies is the difficulty of determining actual or ultimate "ground" truth. To determine whether or not a polygrapher accurately opined as to a subject's truthfulness or deceptiveness, the person conducting the study must know if the subject was actually truthful or deceptive. Three types of studies have been undertaken to attempt to arrive at a finding of ground truth. (See generally Record at 35–36 (Hearing of April 26, 1984).

First, researchers have reviewed polygraph results in criminal investigations where an individual later confessed to the crime. In this "confession-verified" type study, it is assumed that the confession establishes ground truth, *i.e.*, the individual who confessed is presumed guilty, and all other suspects who were subjected to polygraph examination are presumed innocent. The polygraph results produced during the investigation are then compared to this finding of ground truth.

Second, researchers have attempted to ascertain polygraph validity through a "case file" method of analysis. Under this method, researchers assemble entire investigative files on a particular crime in which numerous individuals were polygraphed. The file is then given to a panel of "experts," such as attorneys, who are instruct-

ed to consider all of the evidence (apart from any polygraph results), both admissible and inadmissible, and to identify the perpetrator. This conclusion is considered to be ground truth. A comparison of polygraph opinions with ground truth is made and an accuracy rate is then reported.

Finally, researchers have conducted controlled, laboratory-like experiments called "mock crime" studies. A mock crime is "committed" according to plan by an individual known to the researcher. This individual, along with other actors,[7] is then polygraphed. The polygraph result is then compared to known ground truth, *i.e.*, the person known to be acting guilty of the mock crime, and the others known to be acting innocent.

22. In the scientific literature polygraph result errors are of two types. A "false negative" error occurs when a deceptive individual is erroneously reported truthful. A "false positive" error occurs when a truthful individual is erroneously reported deceptive. Record at 15 (Hearing of April 26, 1984).

23. A compilation of the results of all confession-verified studies involving commercial polygraph examiners reveals that the examiners achieved a 90% accuracy rate on truthful subjects. Stated differently, there was a 10% false positive error rate, resulting in 10% of the tested persons being falsely reported as deceptive. Record at 61 (Hearing of April 16, 1984). A 1977 confession-verified study of law enforcement polygraphers, conducted by Dr. Horvath, revealed a 51% accuracy rate on innocent persons—a false positive rate of 49%, or 49% of the tested persons being falsely reported as deceptive. Record at 62 (Hearing of April 26, 1984).

24. A compilation of the results of all case file studies presented to the court reveals that polygraph examiners achieved an 88.5% accuracy rate on truthful subjects.[8] Stated differently, an 11.5% false

---

7. The validity of mock crime studies is highly suspect because the actors have no true fear of being falsely accused—no loss of liberty or employment is at stake.

8. This figure was derived by averaging the re-

positive error rate occurred. Record at 54–57 (Hearing of April 26, 1984).

25. A compilation of the results of mock crime studies involving non-adjusted and adjusted control questions revealed that polygraph examiners achieved a 90% accuracy rate on truthful subjects. Stated differently, a 10% false positive error rate occurred, or 10% of tested persons were falsely reported as deceptive. *See* Defendant's Exhibit 3 (Hearing of April 26, 1984).

26. At least one study has been undertaken to compare the utility of polygraph testing with other forms of identification in criminal investigations. *See* Widacki and Horvath study, Defendants' Exhibit 6 (Hearing of April 26, 1984). In this study a mock crime was set up so that polygraph examinations, handwriting comparisons, eyewitness identification, and fingerprint comparisons could be made. The results of this study revealed the following false positive error rates:

| Identification Method | False Positive Error Rate |
| --- | --- |
| Polygraph | 1.3% |
| Fingerprint | 0% |
| Handwriting | 1.4% |
| Eyewitness | 9.1% |

Defendants' Exhibit 6 (Hearing of April 26, 1984).

27. In November of 1983, the Office of Technology Assessment, an investigative agency of the Congress of the United States, issued a Technical Memorandum entitled "Scientific Validity of Polygraph Testing" which concluded:

Although there is some evidence from available field studies that polygraph testing is effective in detecting deception by guilty criminal suspects, there is also what in some cases might be regarded as a substantial error rate. This is particularly so for innocent subjects. There appears, as yet, to be no scientific field evidence that polygraph examinations can be effectively used to investigate unauthorized disclosures or that they repre-

sults of the 1969 study by Bersh (94%) and the 1977 study by Raskin (83%). Record at 53–57

sent a valid test to prescreen or periodically screen Government employees. Results of field studies are subject to additional problems of interpretation because of inadequate measures of ground truth.

\* \* \* \* \* \*

In sum, OTA concluded that there is at present only limited scientific evidence for establishing the validity of polygraph testing. Even where the evidence seems to indicate that polygraph testing detects deceptive subjects better than chance (when using the control question technique in specific-incident criminal investigations), significant error rates are possible. . . .

Plaintiffs' Exhibit 3 at 58, 96 (Hearing of April 26, 1984).

28. As plaintiffs' expert, Dr. Klienmuntz, stated, two erroneous assumptions underlie the control question technique. First, an emotional reaction to a relevant question, even if more pronounced than a subject's reaction to a control question, is not necessarily indicative of deception. Second, although impossible to quantify, a polygraph examiner's opinion is not based only upon the physiological changes recorded by the polygraph instrument. The examiner's opinion is also based upon subjective (and arguably unreliable) factors such as the subject's demeanor and manner, the inflection of the subject's voice, or changes in the subject's facial expressions. Record at 157 (Hearing of April 26, 1984).

29. If a false positive error occurs, the falsely accused person has no means of challenging or disproving the examiner's opinion. Since neither the pre-test interview, the actual questions propounded, nor the subject's answers are recorded or transcribed, it is impossible for anyone else to review the actual total polygraph examination. With no record or transcript, recipients of test results are forced to rely upon the examiner's opinion—truthful or deceptive. Record at 140, 143 (Hearing of April

(Hearing of April 26, 1984).

26, 1984). The individual's only recourse is to be retested, perhaps at his own expense, by a different polygrapher, Record at 94–95, to hope for a different result and to further hope that a different result will be accepted by the recipient of the false positive report. Even if the subsequent examination exculpates the subject, the employer retains and will remember the original report alleging deception; the subject cannot compel the employer to accept one opinion over the other.

### Governing Law

The plaintiffs complained that the defendants are proceeding in violation of the First, Fifth, Ninth, and Fourteenth Amendments to the Constitution of the United States; they sought a judgment declaring that their constitutional rights are being violated, and restraining defendants from continuing to violate them. The defendants vigorously denied that they, as public employers, are infringing upon any rights of plaintiffs derived from the Constitution or laws of the United States. The arguments and briefs of counsel have focused only on the Fifth and Fourteenth Amendments; those Amendments being dispositive of all issues, it is unnecessary to consider the claims based upon the First and Ninth Amendments.

### The Fifth Amendment

The Fifth Amendment to the Constitution of the United States provides:

*No person* shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor <u>shall be compelled in any criminal case to be a witness against himself</u>, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S.Const. Amend. V (emphasis added).

The right of every person to invoke the constitutional privilege derived from the underlined portion—commonly called the self-incrimination clause of the Fifth Amendment—has been jealously safeguarded by decisions of the Supreme Court of the United States. Those decisions illustrate the meaning and applicability of the self-incrimination clause to this case.

A. A city college was not permitted to summarily discharge an associate professor who invoked the privilege against self-incrimination when questioned by an investigating committee of the United States Senate. To do so is to act arbitrarily in violation of "the very essence of due process." *Slochower v. Board of Education,* 350 U.S. 551, 559, 76 S.Ct. 637, 641, 100 L.Ed. 692 (1956). In so concluding the court explained:

At the outset we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment. The right of an accused person to refuse to testify, which had been in England merely a rule of evidence, was so important to our forefathers that they raised it to the dignity of a constitutional enactment, and it has been recognized as 'one of the most valuable prerogatives of the citizen.' *Brown v. Walker,* 161 U.S. 591, 610, 40 L.Ed. 819, 825, 16 S.Ct. 644 [651]. We have reaffirmed our faith in this principle recently in *Quinn v. United States,* 349 U.S. 155, 99 L.Ed. 964, 75 S.Ct. 668. In *Ullmann v. United States,* 350 U.S. 422, 100 L.Ed. 511, 76 S.Ct. 497, decided last month, we scored the assumption that those who claim this privilege are either criminals or perjurers. The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury. As we pointed out in *Ullmann,* a witness may have a reasonable fear of prosecution

and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances. See Griswold, The Fifth Amendment Today (1955).

*Id.* at 557–58, 76 S.Ct. at 640–41.

B. Police officers cannot be forced to choose between self incrimination and job forfeiture by being told, during a criminal investigation, that while they have a privilege to refuse to answer if disclosure would tend to incriminate them, such a refusal will subject the officer to removal from office. To do so is to violate the Fourteenth Amendment's protection of the individual against coerced statements. *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). As the Court in Garrity observed:

> Coercion that vitiates a confession under *Chambers v. Florida* [309 U.S. 227, 60 S.Ct. 472; 84 L.Ed. 716] and related cases can be 'mental as well as physical'; 'the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Subtle pressures may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.' *Lisenba v. California,* 314 U.S. 219, 241, 86 L.Ed. 166, 182, 62 S.Ct. 280 [292].
>
>   \*   \*   \*   \*   \*   \*
>
> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. Arizona* is 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.
>
> It is said that there was a 'waiver.'
>
> . . .

> Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other.
>
> 'It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called.' Ibid.
>
>   \*   \*   \*   \*   \*   \*
>
> Our question is whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee.
>
>   \*   \*   \*   \*   \*   \*
>
> We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.
>
> There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. Engaging in interstate commerce is one. Resort to the federal courts in diversity of citizenship cases is another. Assertion of the First Amendment right is still another. The imposition of a burden on the exercise of a Twenty-fourth Amendment right is also banned. We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.

*Id.* at 496–500, 87 S.Ct. at 618–620 (citations and footnotes omitted).

C. A lawyer cannot be disbarred for refusing to testify at a state judicial inquiry. *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). In so deciding for the first time on Fifth Amendment grounds (as applied to the states by the Fourteenth Amendment), the Court stated:

> We conclude that the Self-Incrimination clause of the Fifth Amendment has

been absorbed in the Fourteenth, that it extends its protection to lawyers as well as to other individuals, and that it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it ....

We said in *Malloy v. Hogan* :

'The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.' 378 U.S., at 8 [87 S.Ct. at 1493], 12 L.Ed.2d at 659.

In this context 'penalty' is not restricted to fine or imprisonment. It means, as we said in *Griffin v. California,* the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.' *Id.* [380 U.S.] at 614 [85 S.Ct. at 1233], 14 L.Ed.2d at 109. We held in that case that the Fifth Amendment, operating through the Fourteenth, 'forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.' *Id.,* at 615 [85 S.Ct. at 1233], 14 L.Ed.2d at 110. What we said in *Malloy* and *Griffin* is in the tradition of the broad protection given the privilege at least since *Boyd v. United States* [116 U.S. 616, 634–635, 6 S.Ct. 524, 534–535, 29 L.Ed. 746] where compulsory production of books and papers of the owner of goods sought to be forfeited was held to be compelling him to be a witness against himself.

'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to

gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.' 116 U.S., at 635 [65 S.Ct. at 535], 29 L.Ed. at 752.

The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege. That threat is indeed as powerful an instrument of compulsion as 'the use of legal process to force from the lips of the accused individual the evidence necessary to convict him ....' *United States v. White,* [322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542.] As we recently stated in *Miranda v. Arizona,* 'In this Court, the privilege has consistently been accorded a liberal construction.' ... We find no room in the privilege against self-incrimination for classifications of people so as to deny it to some and extend it to others. Lawyers are not excepted from the words 'No person ... shall be compelled in any criminal case to be a witness against himself'; and we can imply no exception. Like the school teacher in *Slochower v. Board of Education* [350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692.] and the policemen in *Garrity v. New Jersey* [385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562] lawyers also enjoy first-class citizenship.

*Id.* at 514–16, 87 S.Ct. at 627–29 (citations and footnotes omitted).

D. A city policeman could not be subpoenaed before a state grand jury to answer questions in connection with alleged bribery and corruption of police officers, asked to sign a "waiver of immunity" after being told he would be fired if he did not sign, and then dismissed for failure to sign a waiver. *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). In so concluding the Supreme Court reviewed its prior decisions and set forth the following overview of the constitutional issues:

Our decisions establish beyond dispute the breadth of the privilege to refuse to respond to questions when the result may be self-incriminatory, and the need fully to implement its guaranty. The privilege is applicable to state as well as federal proceedings. The privilege may be waived in appropriate circumstances if the waiver is knowingly and voluntarily made. Answers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connections with a criminal prosecution against the person testifying.

The question presented in the present case is whether a policeman who refuses to waive the protections which the privilege gives him may be dismissed from office because of that refusal.

About a year and a half after New York City discharged petitioner for his refusal to waive this immunity, we decided *Garrity v. New Jersey*. In that case, we held that when a policeman had been compelled to testify by the threat that otherwise he would be removed from office, the testimony that he gave could not be used against him in a subsequent prosecution. Garrity had not signed a waiver of immunity and no immunity statute was applicable in the circumstances. Our holding was summarized in the following statement ([385 U.S.] at 500 [87 S.Ct. at 620], 17 L.Ed.2d at 567): 'We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.'

The New York Court of Appeals considered that Garrity did not control the present case. It is true that Garrity related to the attempted use of compelled testimony. It did not involve the precise question which is presented here: namely, whether a State may discharge an officer for refusing to waive a right which the Constitution guarantees to him. The New York Court of Appeals also distinguished our post-Garrity decision in *Spevack v. Klein, supra*. In *Spevack*, we ruled that a lawyer could not be disbarred solely because he refused to testify at a disciplinary proceeding on the ground that his testimony would tend to incriminate him. The Court of Appeals concluded that *Spevack* does not control the present case because different considerations apply in the case of a public official such as a policeman. A lawyer, it stated, although licensed by the state is not an employee. This distinction is now urged upon us. It is argued that although a lawyer could not constitutionally be confronted with Hobson's choice between self-incrimination and forfeiting his means of livelihood, the same principle should not protect a policeman. Unlike the lawyer, he is directly, immediately, and entirely responsible to the city or State which is his employer. He owes his entire loyalty to it. He has no other 'client' or principal. He is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer. Unlike the lawyer who is directly responsible to his client, the policeman is either responsible to the State or to no one.

We agree that these factors differentiate the situations. If appellant, a policeman, had refused to answer questions specifically, directly and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, *Garrity v. New Jersey, supra*, the privilege against self-incrimination would not have been a bar to his dismissal.

The facts of this case, however, do not present this issue. Here, petitioner was summoned to testify before a grand jury in an investigation of alleged criminal conduct. He was discharged from office, not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right.

He was dismissed for failure to relinquish the protections of the privilege against self-incrimination. The Constitution of New York State and the City Charter both expressly provided that his failure to do so, as well as his failure to testify, would result in dismissal from his job. *He was dismissed solely for his refusal to waive the immunity to which he is entitled if he is required to testify despite his constitutional privilege. Garrity v. New Jersey, supra.*

*Id.* at 276–78, 88 S.Ct. at 1915–16 (emphasis added) (citations omitted).

E. City sanitation workers could not be summoned before a city official, advised that a refusal to testify on Fifth Amendment grounds about his or any other employee's conduct would result in termination, and then be terminated for asserting his constitutional right not to testify. *Sanitation Men Ass'n v. Commissioner of Sanitation,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). There the Court again explained:

[I]f New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal from public employment without requiring relinquishment of the benefits of the constitutional privilege, and if they had refused to do so, this case would be entirely different. In such a case, the employee's right to immunity as a result of his compelled testimony would not be at stake. But here the precise and plain impact of the proceedings against petitioners as well as of § 1123 of the New York Charter was to present them with a choice between surrendering their constitutional rights or their jobs. Petitioners as public employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination. *Gardner v. Broderick, supra; Garrity v. New Jersey, supra;* Cf. *Murphy v. Waterfront Commission,* 378 U.S. 52, at 79, 12 L.Ed.2d 678, at 695, 84 S.Ct. 1594 [at 1607] (1964). At the same time, petitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights.

*Id.* at 284–85, 88 S.Ct. at 1919–20.

F. Architects performing services by contract with a state could not be subjected to the cancellation of existing contracts and disqualification from further transactions for five years on account of their refusal to waive immunity or to answer questions with respect to their transactions. *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). In so deciding, the Court said:

The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.' The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. *McCarthy v. Arndstein,* 266 U.S. 34, 40, 69 L.Ed. 158, 45 S.Ct. 16 [17] (1924), squarely held that

'[t]he privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant.'

In this respect, *McCarthy v. Arndstein* reflected the settled view in this Court. The object of the Amendment 'was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime.' This is the rule that is now applicable to the States. *Malloy v. Hogan,* 378 U.S. 1, 12 L.Ed.2d 653, 84

S.Ct. 1489 (1964). 'It must be considered irrelevant that the petitioner was a witness in a statutory inquiry and not a defendant in a criminal prosecution, for it has long been settled that the privilege protects witnesses in similar federal inquiries.' *Id.*, at 11, 12 L.Ed.2d 653 [84 S.Ct. at 1495]. In any of these contexts, therefore, a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which is is a defendant.

\*　　\*　　\*　　\*　　\*　　\*

[I]n almost the very context here involved, this Court has only recently held that employees of the State do not forfeit their constitutional privilege and that they may be compelled to respond to questions about the performance of their duties but only if their answers cannot be used against them in subsequent criminal prosecutions. *Garrity v. New Jersey*, 385 U.S. 493, 17 L.Ed.2d 562, 87 S.Ct. 616 (1967); *Gardner v. Broderick*, 392 U.S. 273, 20 L.Ed.2d 1082, 88 S.Ct. 1913 (1968); *Sanitation Men v. Sanitation Comm'r*, 392 U.S. 280, 20 L.Ed.2d 1089, 88 S.Ct. 1917 (1968).

\*　　\*　　\*　　\*　　\*　　\*

We agree with the District Court that *Garrity, Gardner,* and *Sanitation Men* control the issue now before us. The State sought to interrogate appellees about their transactions with the State and require them to furnish possibly incriminating testimony by demanding that they waive their immunity and by disqualifying them as public contractors when they refused. It seems to us that the State intended to accomplish what *Garrity* specifically prohibited—to compel testimony that had not been immunized. The waiver sought by the State, under threat of loss of contracts, would have been no less compelled than a direct request for the testimony without resort to the waiver device. A waiver secured under threat of substantial economic sanction cannot be termed voluntary.

\*　　\*　　\*　　\*　　\*　　\*

We should make it clear, however, what we have said before. Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use .... [G]iven adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment .... But the State may not insist that appellees waive their Fifth Amendment privilege against self-incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them. Rather, the State must recognize what our cases hold: that answers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence. Hence, if answers are to be required in such circumstances States must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity.

*Id.* at 77–85, 94 S.Ct. at 322–326 (citations and footnotes omitted).

G. A political party officer cannot be removed by the state from his position and barred from holding party or public office for five years for refusing to waive his constitutional privilege against compelled self-incrimination. *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). After reviewing prior decisions already referred to, the Court stated:

These cases settle that government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized. It is true, as appellant

points out, that our earlier cases were concerned with penalties having a substantial economic impact. But the touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids.

\* \* \* \* \* \*

Appellant argues that even if § 22 is violative of Fifth Amendment rights, the State's overriding interest in preserving public confidence in the integrity of its political process justifies the constitutional infringement. We have already rejected the notion that citizens may be forced to incriminate themselves because it serves a governmental need. *E.g., Lefkowitz v. Turley*, 414 U.S., at 78–79, 38 L.Ed.2d 274, 94 S.Ct. 316 [at 322–323]. Government has compelling interests in maintaining an honest police force and civil service, but this Court did not permit those interests to justify infringement of Fifth Amendment rights in *Garrity, Gardner,* and *Sanitation Men,* where alternative methods of promoting state aims were no more apparent than here.

*Id.* at 806–08, 97 S.Ct. at 2136–37.

*The Fifth Amendment as Applied to Plaintiffs*

■ As the Fifth Amendment and these decisions of the Supreme Court clearly command, the defendant cities and city officials generally may not require any employee, including but not limited to plaintiffs, to waive or give up the constitutional privilege against compelled self-incrimination as a condition of continued employment or as a part of the employee disciplinary process. The important interests of these municipal governments in maintaining an honest police force and fire service do not justify infringing upon the more compelling interest that all persons have in the preservation of the privilege against compelled self-incrimination derived from the Fifth Amendment.

In particular, the defendant City of Milledgeville may not require its employees "to sign documents necessary for the administration of a polygraph examination, including ... a waiver," see Finding of Fact No. 4, for to do so is to require employees to waive the constitutional privilege against compelled self-incrimination. Neither may the City of Milledgeville or the City of Albany directly, or through others such as agents of the Georgia Bureau of Investigation, as part of a criminal investigation offer employees the opportunity to waive the constitutional privilege against compelled self-incrimination, for to do so is to implicitly suggest that the employee waive his constitutional right as a condition of continued employment or to intimate that his waiver or refusal to waive will be considered in future personnel decisions. Both the obvious and the subtle requirement to waive the constitutional privilege against compelled self-incrimination are equally offensive to the Fifth Amendment and the decisions of the Supreme Court.

■ This does not mean that the defendant cities and city officials are prohibited from requiring employees—policemen, firemen, and others—"to answer questions specifically, directly, and narrowly relating to the performance of [their] official duties, without being required [directly or implicitly] to waive ..." the constitutional privilege against compelled self-incrimination, *Gardner v. Broderick*, 392 U.S. at 278, 88 S.Ct. at 1916, and from disciplining or discharging employees for refusing to answer such questions. *Sanitation Men Ass'n v. Commissioner of Sanitation*, 392 U.S. at 284, 88 S.Ct. at 1919. The defendants may do so.

■ This further does not mean that the defendant cities and city officials—if state law authorizes them to do so—may not confer the limited use immunity required by the Fifth Amendment on their employees and then require employees to answer questions or testify as a condition of continuing to be employed. The limited use immunity that is required must emanate

from a law or statute and must lawfully assure the employee, who refuses on the basis of his privilege against self-incrimination to testify or provide information, that no testimony or other information compelled (or any information directly or indirectly derived from such testimony or other information) may be used against the employee in any criminal case other than a prosecution for perjury, giving a false statement or failing to comply with a court order. See 18 U.S.C.A. § 6001, *et seq.* (West 1984) as an example of a limited use immunity statute.

Georgia law [9] authorizes the attorney general or any district attorney to obtain an order of the superior court granting use and derivative use immunity, but does not authorize municipal governments or officials thereof—including police and fire chiefs—to confer limited use immunity. These defendants do not have legal authority to grant immunity, and thus may not assure their employees of use immunity and require them to testify or answer questions as a condition of continued employment. As the Supreme Court observed in *Lefkowitz v. Cunningham,*

> Once proper use immunity is granted, the State may use its contempt powers to compel testimony concerning the conduct of public office, without forfeiting the opportunity to prosecute the witness on the basis of evidence derived from other sources.

431 U.S. at 809, 97 S.Ct. at 2137 (emphasis added). Proper use immunity can only be conferred in a manner authorized by law. Until it is, defendants may not compel employees to answer in spite of their self-incrimination privilege.

Assuming obedience to the commands of and prohibitions surrounding the self-incrimination clause, the court turns to the issue of whether the defendant cities can require the plaintiff police and fire department employees to submit to a polygraph examination, the results of which will be used for determining whether to discipline or discharge the employee, or, alternatively, whether the defendant cities can discharge plaintiff employees for refusing to submit to a polygraph examination.

### The Fourteenth Amendment

The plaintiff city employees' constitutional rights are derived from the Fourteenth Amendment to the Constitution of the United States which, since its adoption in 1868, has provided:

> Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law shich shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of life, liberty, or property, without due process of law;* nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV (emphasis added).

As the defendants concede, these plaintiff city employees, as a matter of state law, have a property right in their public jobs that is protected by the due process

---

**9.** O.C.G.A. § 24–9–28 (1982) provides:

(a) Whenever in the judgment of the Attorney General or any district attorney the testimony of any person or the production of evidence of any kind by any person in any criminal proceeding before a court or grand jury is necessary to the public interest, the Attorney General or the district attorney may request the superior court in writing to order that person to testify or produce the evidence. Upon order of the court that person shall not be excused on the basis of his privilege against self-incrimination from testifying or producing any evidence required; but no testimony or other evidence required under the order or any information directly or indirectly derived from such testimony or evidence may be used against the person in any proceedings or prosecution for a crime or offense concerning which he testified or produced evidence under court order. However, he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing, or contempt committed in testifying or failing to testify, or in producing or failing to produce evidence in accordance with the order but *shall not be required to produce* evidence that can be used in any other courts, including federal courts.

clause: "nor shall any State deprive any person of ... property, without due process of law ...." *Id.* If defendants take disciplinary action against these public employees they will deprive them of this property right.

Alternatively, the liberty guaranteed to the plaintiffs by the due process clause is implicated in that these plaintiff policemen and firemen are being investigated and polygraphed for possibly using and distributing illegal drugs—accusations that might seriously damage the standing, associations, good names, and reputations of the plaintiffs in their communities. Disciplining or discharging any plaintiff employee in whole or in part on account of a polygraph examiner's opinion of deceptiveness, or on account of a refusal to submit to a polygraph examination, will impose a stigma or other disability on the disciplined employee that will affect his current employment with defendants, and possibly foreclose his ability to take advantage of other, prospective employment opportunities.

█ The Supreme Court has ruled that an injury to one's "good name and reputation" normally does not give rise to a cause of action under the Fourteenth Amendment for a deprivation of "liberty." *See Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *see generally* Gunther, *Constitutional Law* 661–66 ("The Shrinking Scope of 'Liberty' in the Procedural Due Process Cases") (10th ed. 1980). However, where a public employer publicly discloses the reasons for an employee's discharge, and those reasons are false and disparaging, a deprivation of a protected liberty interest may occur. *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

While this court cannot predict with certainty that the defendant city employer's will publicly announce the results of polygraph examinations, the court may assume that defendants will respond truthfully to inquiries by prospective employers concerning the reasons for disciplinary action. Therefore, to the extent polygraph results may become a permanent part of plaintiffs' employment histories, their liberty interests under the Fourteenth Amendment are adversely affected.

What protections does due process afford before such deprivations can take place? In answering that question it is important to be mindful of the Supreme Court's admonition:

At its core, the right to due process reflects a fundamental value in our American constitutional system....

Perhaps no characteristic of an organized and cohensive society is more fundamental than its erection and enforcement of a system of rules defining the various rights and duties of its members, enabling them to govern their affairs and definitively settle their differences in an orderly, predictable manner. Without such a 'legal system,' social organization and cohesion are virtually impossible; with the ability to seek regularized resolution of conflicts individuals are capable of interdependent action that enables them to strive for achievements without the anxieties that would beset them in a disorganized society. Put more succinctly, it is this injection of the rule of law that allows society to reap the benefits of rejecting what political theorists call the 'state of nature.'

American society, of course, bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, not on custom or the will of strategically placed individuals, but on the common-law model. It is to courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly process of dispute settlement. Within this framework, those who wrote our original Constitution, in the Fifth Amendment, and later those who drafted the Fourteenth Amendment, recognized the centrality of the concept of due process in the operation of this system. Without this guarantee that one may not be deprived of his rights, neither liberty nor property, without due process of law, the

State's monopoly over techniques for binding conflict resolution could hardly be said to be acceptable under our scheme of things. Only by providing that the social enforcement mechanism must function strictly within these bounds can we hope to maintain an ordered society that is also just. It is upon this premise that this Court has through years of adjudication put flesh upon the due process principle.

*Boddie v. Connecticut,* 401 U.S. 371, 374–75, 91 S.Ct. 780, 784–85, 28 L.Ed.2d 113 (1971).

In putting flesh upon the due process clause the Court in *Boddie* described the cardinal principle of due process—a meaningful opportunity to be heard. In so doing the Court stated:

> Prior cases establish, . . . that due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard. Early in our jurisprudence, this Court voiced the doctrine that '[w]herever one is assailed in his person or his property, there he may defend,' *Windsor v. McVeigh,* 93 U.S. 274, 277, 23 L.Ed. 914, 915 (1876). *See Baldwin v. Hale,* 1 Wall 223, 17 L.Ed. 531 (1864); *Hovey v. Elliott,* 167 U.S. 409, 42 L.Ed. 215, 17 S.Ct. 841 (1897). The theme that 'due process of law signifies a right to be heard in one's defence [sic],' *Hovey v. Elliott, supra,* at 417, 42 L.Ed. at 221 [17 S.Ct. at 844], has continually recurred in the years since *Baldwin, Windsor,* and *Hovey.* Although '[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause,' as Mr. Justice Jackson wrote for the Court in *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 94 L.Ed. 865, 70 S.Ct. 652 (1950), 'there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.' *Id.,* at 313, 94 L.Ed. at 873 [70 S.Ct. at 656].
>
> Due process does not, of course, require that the defendant in every civil case actually have a hearing on the merits. A State, can, for example, enter a default judgment against a defendant who, after adequate notice, fails to make a timely appearance, see *Windsor, supra,* at 278, 23 L.Ed. at 916, or who, without justifiable excuse, violates a procedural rule requiring the production of evidence necessary for orderly adjudication, *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 351, 53 L.Ed. 530, 545, 29 S.Ct. 370 (1909). *What the Constitution does require is 'an opportunity . . . granted at a meaningful time and in a meaningful manner,'* Armstrong v. Manzo, *380 U.S. 545, 552, 14 L.Ed.2d 62, 66, 85 S.Ct. 1187 [1191] (1965) (emphasis added), 'for [a] hearing appropriate to the nature of the case,'* Mullane v. Central Hanover Tr. Co., *supra* [339 U.S.] at 313, 94 L.Ed. at 873 [70 S.Ct. at 657]. The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an *opportunity for a hearing* before *he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event. In short, 'within the limits of practicability,' id., at 318, 94 L.Ed. at 875 [70 S.Ct., at 659] a State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause.*

*Id.* at 377–79, 91 S.Ct. at 785–87 (emphasis added) (footnotes omitted).

Due process consists of two primary components: adequate notice[10] to the employee and a fair hearing.

The goal of a fair hearing is to arrive at the truth. A fact-finding procedure reasonably calculated to arrive at the truth is required. The formality and procedural requisites for a "fair hearing" vary depending on the importance of the interests at stake. *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). In a discharge from public employment context, the decisions of the Court of Appeals of this circuit require that the following procedural safeguards be afforded public employees such as plaintiffs: (1) the employee must "be advised of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist;" (2) he must "be advised of the names and the nature of the testimony of witnesses against him;" (3) "at a reasonable time after such advice he must be accorded a meaningful opportunity to be heard in his own defense;" and (4) the "hearing should be before a tribunal that both possesses some expertise [in the occupation of the employee] and has an apparent impartiality toward the charges." *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir.1970). These procedures contemplate that the employee will be advised of the evidence against him, and that he will be given "an effective opportunity to rebut [that evidence]." *Glenn v. Newman*, 614 F.2d 467, 472 (5th Cir.1980); *Thurston v. Dekle*, 531 F.2d 1264 at 1273 (5th Cir.1976). They further contemplate a human decision maker familiar with the day-to-day circumstances of the employee's position. This familiarity ensures that the decision maker will be capable of assessing the credibility of those who testify, and be able to determine the appropriate weight to be given to all other evidence.

*Use of Polygraph Examination Results*

The defendants intend to use polygraph examination results in deciding whether to discipline, suspend, or discharge each plaintiff. Alternatively, defendants intend to discharge any plaintiff who refuses to submit to a polygraph examination. Does the due process concept as applied to this case permit defendants to do so?

In essence, the previously recited findings of fact show that the result of a polygraph examination is nothing more than the polygraph examiner's personal opinion of the truthful or deceptive manner in which the questioned person responded during an unrecorded pre-test interview and during a question and answer session while monitored by a polygraph instrument. An opinion of a polygraph examiner that a person questioned about criminal misconduct has deceptively denied misconduct is obviously tantamount to a finding by a polygraph examiner that the examined person is guilty of misconduct. Therefore, for defendants to cause a polygraph examination to be administered and to act in whole or in part upon the polygraph examiner's opinion—without having any basis to evaluate the correctness of that opinion—is to delegate to a polygraph examiner the responsibility of investigating employee misconduct and concluding whether or not the employee is guilty. The polygraph examiner in reality becomes both judge and jury.

Defendants suggest that they do not intend to rely upon an examiner's opinion of deceitfulness—guilt—in the absence of other evidence of wrongdoing; that employees can be afforded a meaningful hearing as to the other evidence of wrongdoing; and that reliance upon polygraph examination results is thus consistent with, and only a part of, the due process hearing to which plaintiffs are entitled.

Plaintiffs claim that the polygraph examiner's opinion is not testimony or evidence that should be permitted to be heard or considered by a public employer as a part of a required due process hearing. Plaintiffs further claim that the polygraph test-

---

**10.** Plaintiffs do not assert that the pre- and post-termination hearing procedures employed by defendants fail to provide adequate notice of the alleged wrongdoing. Therefore, the court's analysis is limited to the "fair hearing" component of procedural due process.

ing process is so unreliable that it in no way qualifies as a part of the required due process procedure.

To suggest that the defendant cities or their officials in the absence of other evidence of wrongdoing will disregard and forget a polygraph examiner's opinion of employee deceitfulness is to invite the court to ignore the candid admission of defendant City of Albany's Chief of Police that in making future personnel decisions he would most likely remember and therefore consider a polygraph report of deceitfulness. See Findings of Fact No. 11. To so suggest is to further invite the court to refrain from using its common sense. To so suggest is also to invite the court to ask why an employer who does not intend to rely upon the result of a polygraph examination is requiring employees to take such an examination at all. If independent evidence of wrongdoing exists, the defendant employers can arrive at a decision without the opinion of a polygraph examiner. In spite of the defendants' good intentions, this court must conclude that the adverse result of every polygraph examination defendants desire to administer will be utilized by defendants at some time in making personnel decisions in which plaintiffs have an interest protected by due process.

Having determined that defendants' use of polygraph examinations constitutes a delegation of the defendants' responsibility to ascertain the facts, the court must determine if disciplinary action taken upon the basis of this delegation satisfies the requirements of due process.

### A. *Plaintiffs' Opportunity to be Heard*

Because of defendants' delegation of responsibility, the polygraph examiner becomes the arbiter of the facts and the decision maker as to guilt or innocence. The decision maker, of course, is bound by the requirements of due process, as set forth in *Glenn v. Newman, Thurston v. Dekle,* and *Ferguson v. Thomas, supra,* which require that the employee be provided with a meaningful opportunity to be heard and to rebut the evidence against him.

For the polygraph examination to begin to satisfy those safeguards the examiner would have to hear evidence for and against the employee, weigh the credibility of the witnesses, and allow the accused employee an opportunity to rebut the evidence before arriving at a conclusion. As the evidence shows, the polygraph examination is not administered in that manner. The polygrapher questions only the employee. The polygrapher formulates the questions. The polygrapher investigates nothing and does not consider anything other than the pre-test interview, the employee's answers, and the reaction of the employee shown on the polygraph instrument. The employee is not allowed to present any evidence or otherwise dispute a suggestion of wrongdoing. Since the pre-test interview and the examination itself are seldom, if ever, recorded, the test cannot be replicated, and thus the employee can never rebut the original examination. The examination report becomes a part of the employee's personnel record; even if the employee incurs the expense of obtaining a second opinion, he can never compel an expungement of the original report of deception.

As discussed above, the hallmark of procedural due process is a meaningful opportunity to be heard. *Boddie v. Connecticut,* 401 U.S. at 378, 91 S.Ct. at 786. Reliance on the results of the polygraph test denies this opportunity. The very nature of the polygraph testing process precludes the employee from demonstrating any error that the polygraph examiner may have made. The result being a subjective opinion of the examiner, there is no way for the employee to disprove that opinion. All the employee can do is insist that he responded truthfully. The defendants, having paid for the polygrapher's services and having received his opinion, will turn a deaf ear to the employee's protestations.

### B. *The Validity of the Polygraph as a Fact-finding Procedure*

Apart from the requirement of an opportunity to be heard, the fair hearing compo-

nent of procedural due process also requires a procedure designed to ascertain the truth with reasonable accuracy.

Because of the lack of scientific evidence in support of polygraph validity, polygraph results are inadmissible as evidence in criminal prosecutions, both in United States courts, *see United States v. Clark*, 598 F.2d 994, 995 (5th Cir.1979), *reh'g en banc dismissed*, 622 F.2d 917 (5th Cir.1980), and in Georgia courts. *See Feltham v. Cofer*, 149 Ga.App. 379, 381, 254 S.E.2d 499, 501 (1979). *See generally* McCormick on Evidence § 207 at 504–07 (2d ed. 1972). Further, polygraph results are inadmissible in Georgia administrative proceedings. *Feltham v. Cofer*, 149 Ga.App. at 381, 254 S.E.2d at 501.

Because of the proven scientific inaccuracy of the results of polygraph examinations, this court determines that a deferral to the opinion of a polygraph examiner fails to satisfy the defendant employers' obligation to employ a fact-finding process reasonably designed to ascertain the truth.

The evidence and the scientific literature demonstrate that polygraph examiners commit false positive errors—instances in which a truthful subject is falsely accused as deceptive—in between 10% and 49% of all cases. As both experts observed, there is no pattern of physiological responses characteristic only of deception. There is no scientific evidence to support the underlying theory that a polygrapher can distinguish physiological responses caused by deception from responses caused by any number of emotions likely to be triggered by a relevant question. Further, as Dr. Klienmuntz testified, it is impossible to quantify and exclude the extent to which a polygrapher's final opinion is improperly influenced by factors other than recorded physiological responses, such as the subject's demeanor and reactions to interrogation.

The evidence presented to this court in support of polygraph validity convinced this court that the polygraph examination is not a valid test of whether a person is answering questions truthfully or deceptively. Being an invalid test, it does not constitute testimony permitted by due process that may be used as a part of a hearing to discipline or terminate plaintiffs.

C. *Questions Specifically, Directly and Narrowly Relating to the Performance of Plaintiffs' Official Duties*

Because public employees are accountable to their public employers they may be required to answer questions specifically, directly, and narrowly relating to the performance of their official duties, provided there is no requirement to waive the self-incrimination privilege. *Gardner v. Broderick*, 392 U.S. at 278, 88 S.Ct. at 1916. Under these conditions an employee may be terminated either because of his answers or because of his refusal to answer. *Id.* Under this concept the public employer receives the employees answers to the specific, direct, narrow questions and may act on the basis of such answers. In so doing, the employee makes the decision. As is apparent from what has already been said, a polygraph examination is foreign, to and inconsistent with that concept. The technique for administering a polygraph examination does not permit questioning to be so limited. The very nature of the control question technique requires the examiner to propound questions about wrongdoing *unrelated* to the matter under investigation. *See* Finding of Fact No. 19. In order for the test to be administered, the employee must be asked questions such as, "While employed as a police officer, did you do anything that, if discovered, would have discredited your badge?", or "During the first twenty-one years of your life, have you ever lied to anyone who trusted you?". *See* note 5 and Finding of Fact No. 19, *supra*.

Employees such as plaintiffs, having been ordered to submit to the examination, will feel compelled to bare their souls in response to these questions, even though they are totally unrelated to the performance of their duties and the alleged drug use under investigation. Plaintiffs cannot be assured that inculpatory responses to

**1478**

control questions will not be remembered and used against them, even if they "pass" the polygraph. The very nature of polygraph interrogation requires the employee to jeopardize his constitutional right of privacy and his liberty interest in his good name and reputation by answering broad inquiries about wrongdoing unrelated to the specific matter under investigation. Accordingly, this court concludes that polygraph testing cannot satisfy the commands of the Fifth and Fourteenth Amendments.

### Conclusion

In summary, defendants have failed to interrogate plaintiffs in a manner consistent with the Fifth Amendment. Apart from the aforementioned Fifth Amendment considerations, any disciplinary action taken in whole or in part upon the basis of a polygraph examination will result in plaintiffs' loss of a vested property right without due process. This conclusion is based upon this court's finding that: the defendants' use of polygraph results constitutes a delegation of defendants' fact-finding responsibilities to the polygraph examiner; that this delegation fails to provide plaintiffs with a meaningful opportunity to be heard; that the polygraph test itself is not reasonably designed to ascertain the truth; and that polygraph interrogation is not limited to questions specifically, directly, and narrowly related to the wrongdoing under investigation in these actions—all in violation of plaintiffs' right to a fair hearing.

Since a polygraph examination may not wholly or partly be the basis for disciplining or discharging any of plaintiffs, it naturally follows that defendants may not discipline or discharge plaintiffs for refusing to take a polygraph examination.

Accordingly, defendants are hereby PERMANENTLY ENJOINED from requiring plaintiffs to submit to polygraph testing; in the absence of independent evidence of wrongdoing, defendants shall take no disciplinary action based upon the results of any polygraph examination previously completed, nor shall defendants take any disciplinary action based upon an employee's refusal to submit to a polygraph examination.