Juanita M. JONES, Plaintiff,

v.

Floretta Dukes McKENZIE, et al., Defendants.

Civ. A. No. 85–1624.

United States District Court, District of Columbia.

Feb. 25, 1986.

Jeffrey A. Dunn, David A. Soley, Gary M. Hnath, Venable, Baetjer, Howard & Civiletti, Washington, D.C., for plaintiff.

Inez Smith Reid, Corp. Counsel, D.C., John H. Suda, Principal Deputy Corp. Counsel, D.C., Martin L. Grossman, Deputy Corp. Counsel, D.C., Johnny M. Howard, Chief, Gen. Litigation, Section II, Arlene L. Robinson, Asst. Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff sues the District of Columbia and those responsible for the School System's employee drug-use surveillance program,[1] challenging their decision to discharge her for alleged violation of a directive that required that school personnel refrain from using, possessing or being under the influence of marijuana while on school premises. Plaintiff claims that defendants' actions with respect to her discharge were arbitrary and capricious, violated her rights under the 4th and 5th Amendments and her right to privacy, and constituted violations of applicable Board of Education rules and Superintendent's Directives. She also claims that defendants failed to satisfy the requirements of the District of Columbia Administrative Procedures Act and were negligent in terminating her employment. Plaintiff seeks both injunctive relief and damages under 42 U.S.C. § 1983.

---

1. Named individually as defendants are Floretta Dukes McKenzie, Superintendent of District of Columbia Public Schools, and William J. Bedford, Director of the Division of Logistical Support, D.C. Public Schools.

Presently before the Court are defendants' motion to dismiss or, in the alternative, for summary judgment, and plaintiff's motion for partial summary judgment on Counts I, II, III and V of her complaint. Counsel have filed extensive briefs supplemented by documentary evidence and affidavits, and the matter has been argued.

## I.

In 1977, the Superintendent of the District of Columbia Schools issued Directive 662.13 which states in pertinent part:

[I]t is strictly prohibited for school personnel ... to possess, use or be under the influence [footnote omitted] of ... narcotics, [footnote omitted] or other drugs such as LSD, marijuana and the like, while on school premises. Personnel found violating this directive will be subject to suspension and/or termination.

The Directive defined "under the influence" as

[a]ny abnormal mental or physical condition resulting from indulging in any degree in intoxicating liquors, narcotic drugs or other drugs which tend to deprive one of the clearness of thought and control of himself which he would otherwise possess.

In the summer of 1984 the District of Columbia School System initiated a program of urinalysis testing for the detection of illegal drugs, and the System's Transportation Division implemented the program by requiring over 200 Transportation Division employees to take physical examinations which included urinalysis testing for drugs. Interrogatory Answer 18. The Division initiated the program because of, *inter alia,* a significant increase in traffic accidents and absenteeism, and the discovery of syringes and bloody needles in restrooms frequented by Transportation Division employees. Interrogatory Answer 6.

Before the program began, William C. French, Transportation Officer, had written to his superior, William J. Bedford, that "[a] major problem in this branch is the high percentage of employees that are ac-

tually using narcotics while on duty or reporting to work after using narcotics and having their performance of duty affected accordingly." Letter from William C. French to William J. Bedford at 1 (May 17, 1984). French cited examples. *Id.* at 1–2. He described the difficulty encountered in attempting to use conventional law enforcement techniques to detect and discipline drug users. He emphasized that:

The responsibility inherited [sic] in the mission of this branch in transporting handicapped students and other students in a safe manner is immeasurable .... [I]mmediate action must be taken to drastically reduce or eliminate the narcotic problem.

*Id.* at 3.

French recommended adaption of the system used by the Washington Metropolitan Area Transit Authority for "drug or alcohol using employees as well as the screening of new applicants." Whereas WMATA limited physical examinations, including drug screening to employees suspected of using drugs and to new applicants, French recommended that the Division be authorized to require all of its employees to take a physical examination which included drug screening.

On May 24, 1984, French's supervisor, Bedford, forwarded the recommendation to the Associate Superintendent with the affirmation that he was aware of each of the incidents recited by French and could "attest to the fact that some drastic measure must be initiated as quickly as possible ... prior to the opening of school in September." Letter from William J. Bedford to Dr. James Brown (May 24, 1984).

On June 12, 1984, the Superintendent issued Directive 205.1. It required the "urinalysis testing of all employees who are or will be required to undergo medical examinations to determine physical fitness for licensing and other employment-related reasons." The Directive concluded:

The *confirmed* finding of an illicit narcotic substance in the urine of an employ-

ee ... shall be grounds for termination of that employee .... [Emphasis added.]

To test urine samples obtained from Transportation Division employees, defendants used the EMIT Cannabinoid Urine Assay manufactured by Syva Company. The EMIT test detects the presence of metabolites of the psychoactive chemical THC which produces the intoxicating effect associated primarily with marijuana and hashish. Solely Affidavit at 3, Exhibits 9 and 10. The EMIT test does not indicate when the ingredient was absorbed as THC metabolites may be retained in an individual's system for days or weeks. In addition, the test does not indicate with respect to marijuana whether the ingredient was ingested by active use or as a result of passive inhalation in the presence of others who were smoking marijuana. The manufacturer's label, inserted in each package, bears this legend:

Any positive should be confirmed by an alternative method. Other methods in use for the detection of [delta 9]–THC metabolites include radioimmunoassy (16–18) and gas chromatography-mass spectrometry (19–22).

Soley Affidavit (Sept. 17, 1985), Exhibit 4.

Plaintiff was originally hired in February, 1981, as a "when actually employed" employee (WAE). She served as a school bus attendant and was rehired for the 1981–1982, 1982–1983, and 1983–1984 terms. Her duties were to assist students as they got on and off the buses, particularly handicapped students who require someone to lift them on and off of a bus and to observe and assist them en route to and from school. Except for a hiatus in 1981 when she was terminated in June and reappointed in August, plaintiff worked from 30 to 35 hours each week during the school years and the summers, until August 31, 1984.

In August, 1984, plaintiff submitted to a urinalysis testing for drugs as part of the Transportation Department's testing program. The first test, effected by computer, gave a positive indication that THC metabolites were present in plaintiff's urine. The test was then repeated manually. It was not otherwise confirmed. Plaintiff, upon being informed of the positive test result, immediately voluntarily underwent two additional urinalysis tests, which came back negative for the presence of THC metabolites in her urine.

The Department does not dispute that before requiring plaintiff to take the test, the Department had no particularized suspicion that she had ever used or was under the influence of drugs, either on or off the premises. In fact, defendants failed, in their opposition to plaintiff's motion for partial summary judgment, to traverse plaintiff's representation in her formal statement of material facts that she had never used drugs or marijuana during her period of employment with the District of Columbia.

On August 16, 1984, plaintiff's supervisor notified her that she would be discharged on August 31 because the National Health Laboratories reported that a urine specimen taken in the annual physical examination required of plaintiff and all other transportation employees "indicated positive use of drugs" in violation of the Superintendent's Directive 662.13. The drug she was accused of using was marijuana. Interrogatory Answer 30. The defendants concluded that the positive test indicated that plaintiff "had used and was under the influence of marijuana in violation of Directive 662.13." Interrogatory Answer 33. She was thereupon terminated without a hearing. Twenty-seven other Transportation Division employees were also terminated in August and September, 1984, after testing positive for illegal drugs: 23 for marijuana, 2 for marijuana and other drugs, and 2 for PCP. Interrogatory Answer 19.

Plaintiff thereafter appealed her termination and requested a hearing at which she could appear with counsel and testify and present other evidence. Defendants refused this request and permitted only a written submission. In November, 1984, a hearing examiner employed by the Office

of the D.C. Superintendent of Schools rejected her appeal.

## II.

Plaintiff contends that defendants' termination of her employment violated her constitutional rights as well as rules and regulations of the District of Columbia. Specifically, plaintiff requests a summary judgment that defendants have terminated her without an adequate hearing solely on the basis of one unconfirmed EMIT urinalysis test in violation of her constitutional rights to substantive and procedural due process of law, and subjected her to an unreasonable search and seizure when they conducted a urine test to which she was compelled to submit or lose her job. In addition, plaintiff's pending motion seeks a judgment that her termination without a confirming test by a technique different from EMIT violated directives of the District of Columbia Board of Education and Superintendent of Schools. The complaint also alleges that defendants violated plaintiff's right of privacy and negligently terminated her employment, but she does not seek summary judgment on those claims.

## A.

There is a threshold question of whether a "wages as earned" (WAE) employee like plaintiff had a property interest in her job or a liberty interest in her reputation which was protected by the Due Process Clause. Defendants claim that they never intended to create any property interest in WAE employees; they created the category to give managers flexibility in meeting short term personnel needs without a red tape burden. Defendants cite Directive 650.4 issued by the Superintendent on June 7, 1978, which provides that "a temporary employee is not entitled to a hearing [upon termination] but may have [his] written appeal reviewed and a determination rendered in writing by the Superintendent within ten (10) days of receipt of the appeal." *Id.* at 4. Defendants also claim that WAE employees knew their positions were intermittent and subject to sudden

loss, without "cause." Defendants state that they never assumed that a WAE would return for the next school year. Each WAE was requested to advise the employer whether he or she wished to "reenlist" for another year giving the employer discretion to decide whether to engage the WAE for another year, for a shorter or intermittent period, or not to renew the employment.

■ However, defendants concede that plaintiff's employment was governed by Board of Education Rules 1401.1 and 1401.-2, which permit the termination of an employee only for "cause" without distinguishing between a full time employee and one, like plaintiff, employed in WAE status. Specifically, Rule 1401.1 provides that:

> Adverse action shall be taken for grounds that will promote the efficiency and discipline of the service and *shall not be arbitrary or capricious.* [Emphasis added.]

Rule 1401.2 provides that:

> Just cause for adverse action may include:

> .    .    .    .    .

> (f) Intoxication while on duty;

> .    .    .    .    .

> (h) Violation of the rules, regulations, or lawful orders of the Board of Education

> . . . .

These requirements for a termination which is for cause in the sense of not being arbitrary and capricious confers a property interest which cannot be taken by a government employer without due process. *See Cleveland Board of Education v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Johnson v. United States*, 628 F.2d 187, 194 (D.C.Cir.1980).

It may well be that Rules 1401.1 and 1401.2 do not extend to every casual temporary employee of the Board of Education. Plaintiff's service to her employer, however, was not transitory. For all practical purposes, she had been employed steadily for nearly a full forty hour week for several years. Her correspondence with her employer about renewal of her service for

each ensuing school year is plainly distinguishable from the offer and acceptance of employment by a new employee. The continuity of her service, when coupled with the language of Rule 1401, establish a protected property interest in her job which cannot be taken by the defendants arbitrarily and capriciously or without an appropriate hearing.

■ Nor do defendants meet plaintiff's argument that she had a liberty interest which was offended by the termination of her employment for drug abuse. It is beyond argument that discharge of plaintiff on unsupported charges of drug abuse could severely affect her interest in her "good name, reputation, honor or integrity," and it is well established that such a deprivation of her "liberty" or "property" interest in her reputation triggers constitutional procedural due process requirements. *See Paul v. Davis*, 424 U.S. 693, 708–709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976), *reh'g. denied*, 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). While there is no evidence that defendants published their drug abuse finding, it is a reasonable inference that, unless expunged, the rationale for her termination will remain in her file for automatic publication to any prospective employer of plaintiff. *Compare Hester v. Milledgeville*, 598 F.Supp. 1456, 1473 (M.D.Ga.1984). Moreover, she has been required to file this law suit to protect her rights, thereby involuntarily publicizing the drug charges herself. Accordingly, if defendants' decision to terminate plaintiff was arbitrary and capricious or if she was deprived of an adequate hearing, her status as a WAE should not preclude adjudication or relief.

### B.

Plaintiff establishes that the EMIT test was the sole basis for defendants' decision to terminate her employment. Moreover, it is undisputed that defendants failed to confirm the positive EMIT test report despite the manufacturer's clear . label warning that "positive results should be confirmed by an alternate method," (*see* Solely Affidavit, Exhibit 9) as well as the Superintendent's express directive that a *"confirmed finding of an illicit narcotic substance"* is the approved basis for terminating an employee for drug abuse.[2]

Defendants claim that the positive EMIT test was confirmed in the sense that when the initial automated process was positive, the same test was repeated manually. But this is not confirmation as that term is used in either the Superintendent's directive or the manufacturer's label. The latter identifies alternate confirming tests to include gas chromatography. In addition to the manufacturer's warning that an alternative test should be administered, documents produced by defendants in response to plaintiff's discovery requests are instructive:

> In the circumstances of this case, involving failure to confirm a positive EMIT test result by alternative means, it is unnecessary to reach the question of whether it would be arbitrary and capricious for defendants to conclude from the *confirmed* presence of THC metabolites in the urine of an employee on the school premises that the subject employee has an "abnormal ... physical condition [presence of THC metabolites] resulting from indulging in any degree in ... narcotic drugs or other drugs which tend to deprive one of clearness of thought and control of himself which he would otherwise possess," and thus, by definition, is "under the influence of ... marijuana ... while on school premises" in violation of Directive 662.13.

---

2. In addition, defendants do not dispute with material facts or reasonable inferences plaintiff's contention that even if the positive EMIT test evidenced some exposure to marijuana at some time, it does not evidence either use or being under the influence while on school premises in violation of Directive 662.13. For defendants have formally admitted that the EMIT test does not show whether the subject is using, in possession of, or under the influence of drugs at the time the test is administered. *See* Admissions No. 15, 16 and 17; Plaintiff's Statement Of Material Facts As to Which There Is No Genuine Issue 31, 32 and 33. Defendants failed to respond to plaintiff's Statement of Material Facts with their own statement of genuine issues as required by Local Rule 1–9(i) and thus are deemed to have admitted them.

A June 8, 1983 report by the Food and Drug Administration to several government agencies reviewing the EMIT test stated that "it is important to remind users of this screening test that any positive result (as stated in the package insert) should be confirmed by an alternative method." Plaintiff's Statement of Material Facts No. 51.

A February 18, 1983 letter published by three toxicologists in the *Journal of the American Medical Association* states that "adequate alternative confirmatory tests must be used" in urine tests for marijuana use. *Id.* No. 50.

A scientific advisory written by the United States Center for Disease Control and published by the Public Health Service of the Department of Health and Human Services on September 16, 1983, stated that "[a]ll urine samples positive by the cannabinoid assay need to be confirmed by an alternate method that is as sensitive as the screening test." *Id.*, No. 49.

A scientific study of the EMIT test by the United States Air Force School of Aerospace Medicine requires that all positive results be confirmed by gas liquid chromatography before being reported to local commanders or released to the Air Force. *Id.*, No. 48.

Additional corroboration of the need for confirmation appears in the numerous decisions by state and federal courts around the country, including the opinion of an arbitrator in the District of Columbia, that a single, unconfirmed positive EMIT test is not a rational basis for disciplining the subject of the test. *In the Matter of Arbitration between American Federation of State, County and Municipal Employees, District Council 20, Local 2093, AFL–CIO and the Board of Education of the District of Columbia,* AAA Case No. 1639 0030 85H (Dec. 3, 1985); *see also Anable. v. Ford,* No. 84–6033, slip op. (W.D.Ark.

July 12, 1985); *Higgs v. Wilson,* No. 83–0256P(J), slip op. (N.D.Ky. Feb. 22, 1985); *Johnson v. Walton,* No. S61–84R, slip op. (Vt.Super.Ct. Feb. 14, 1984). Moreover, numerous court decisions have further established as a matter of court usage that confirmation is not effected by a manual rerun of an automated EMIT test. *See, e.g., Crowell v. Wilkinson,* No. 82–1283, slip op. (M.D.Pa. Oct. 12, 1983). *Compare Peranzo v. Coughlin,* 608 F.Supp. 1504, 1507, 1514 and n. 16 (S.D.N.Y.1985).

The consequence of defendants' failure to confirm the positive EMIT test is not cured by their argument that even if the test failed to show actual use or effect on school premises, "it did show that plaintiff was using an illegal substance which is certainly detrimental to the school system." Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment at 4.[3] The School System's rules clearly prohibit detrimental conduct on or off school premises that may affect one's work performance. Even if the off duty use of drugs by Board of Education employees was proscribed with sufficient clarity to authorize termination of a user for conduct detrimental to the Board, that is not the authority invoked by defendants when they terminated plaintiff. Nor is an unconfirmed EMIT test any better proof of such conduct than it is of use or acting under the influence on school premises. *But see* note 2 *supra.*

On the basis of the undisputed facts and these persuasive authorities, plaintiff is entitled to a summary judgment that her termination on the basis of a single unconfirmed EMIT test was arbitrary and capricious. Her termination thus violated the requirements of the Board of Education and the Superintendent that precluded arbitrary and capricious termination. Since the arbitrary and capricious termination on the basis of an unconfirmed EMIT test so clearly violated District of Columbia law, it

---

**3.** This is an apparent reference to section 322.3 of Board of Education Rules concerning employee conduct generally. It provides:

Personal behavior of an employee during non-duty hours is the employee's concern, but this shall not preclude the Superintendent of Schools from taking action against an employee in circumstances where such conduct is detrimental to the Board of Education.

is unnecessary and inappropriate to address the question of whether plaintiff's termination violated substantive due process protections incorporated in the United States Constitution. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Siler v. Louisville & Nashville RR Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909).

The conclusion that termination of plaintiff's employment on the basis of an unconfirmed EMIT test was arbitrary and capricious means, at least, that before defendants can terminate plaintiff again on grounds of drug abuse, they must confirm a positive EMIT test result by an alternative process such as the two suggested by the manufacturer. An accompanying order will impose that requirement.

### C.

■ The question remains whether additional procedural due process was required beyond the opportunity afforded plaintiff and her counsel to make a written submission in the form of an appeal after she was terminated. The Supreme Court has recently reiterated that a deprivation of property by terminating employment must be "preceded by notice and opportunity for hearing appropriate to the nature of the case." *Loudermill, supra,* 105 S.Ct. at 1493, quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). In this case plaintiff had no hearing before she was terminated and her post-discharge hearing was limited to a written submission, albeit in this case a comprehensive one prepared for her by first-class lawyers. It is enough to establish her procedural due process claim that plaintiff was afforded no hearing before she was discharged. This deprivation violated her constitutional right to procedural due process and affords a second ground for a decision in her favor.

It is neither necessary nor appropriate for the Court to prescribe the form of pre-termination hearing which would pass muster as appropriate to the circumstanc-

es. Suffice it to say that the literature furnished by plaintiff, primarily from defendants' files, suggests at a minimum that before plaintiff can be discharged on account of a urine test positive for drugs, some adversary process is in order to determine that (1) she is, in fact, the subject of the particular positive test, and (2) that the positive test has been appropriately confirmed.

■ Recognizing the public's vital interest in the safety of school children, the necessity for a hearing before termination need not preclude temporary reassignment, or even suspension, pending confirmation of a positive EMIT test and a hearing. Such reassignment or suspension is not precluded provided that the hearing is held and the issue resolved promptly, and, if plaintiff survives the confirmation test and the hearing, she is fairly compensated for any loss incurred on account of the reassignment or suspension.

### V.

There remains for consideration plaintiff's claim that subjecting her to urinalysis without probable cause or any individualized consideration, *en masse* with approximately 200 Transportation Department employees was an unreasonable search in violation of the Fourth Amendment. Defendants sought no warrant authorizing them to require plaintiff to furnish a urine specimen or to authorize defendants to have such a specimen examined for drugs. Nor does it appear that they had probable cause for doing so. Defendants concede that they had no particularized reason to believe that plaintiff used, possessed or was under the influence of drugs.

Defendants point, however, to the obvious and special public danger if their personnel who operate and assist in the operation of school buses are under the influence of drugs. They justify their taking and examining urine specimens of all Transportation Department employees on a significant increase in traffic accidents, an increase in absenteeism, several incidents of erratic and abnormal behavior of some De-

partment employees and the discovery of syringes and bloody needles in Transportation Department restrooms. Moreover, defendants claim that an effort to identify drug users by more conventional police methods, e.g., insinuation of an undercover officer into the workplace, was unsuccessful. They emphasize that the testing was done in a discrete manner in health clinics or hospitals where the specimens are given in private.

Thus, while defendants admit that plaintiff was an exemplary employee and that they had no particular reason to believe or suspect that she was one of the Department employees who was using drugs, they claim that there was no feasible way to pinpoint drug users except by testing them all. *Compare Hohri v. United States,* 782 F.2d 227 (D.C.Cir.1986). Furthermore, defendants argue that it is not only appropriate, but necessary, to require a periodic physical examination of personnel responsible for bus operation, that urinalysis is an appropriate incident of a physical examination, and that, in this context, examination of a urine specimen for its drug content involves minimal intrusion on privacy and is quite reasonable in every sense.

Defendants point to precedent authorizing drug screening of all personnel in the armed forces, *Committee for G.I. Rights v. Callaway,* 518 F.2d 466 (D.C.Cir.1975); prisoners, *see, e.g., Storms v. Coughlin,* 600 F.Supp. 1214 (S.D.N.Y.1984); and city employees engaged in extremely hazardous electrical work where one employee's drug abuse could endanger the safety of fellow employees and the public. *See Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga. 1985). Defendants also cite a case indicating that bus drivers have no reasonable expectation of privacy which precludes subjecting them to blood and urine tests for detection of liquor or drug abuse after they have been involved in serious accidents or were suspected of narcotics use. *Division 241 Amalgamated Transit Union (AFL–CIO) v. Suscy,* 538 F.2d 1264, 1267 (7th

Cir.1976), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976). This Circuit has also condoned a mass search for illegal aliens despite the risk of intrusion on innocent bystanders. *See Blackie's House of Beef, Inc. v. Castillo,* 659 F.2d 1211 (D.C.Cir.1981), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982).

Plaintiff counters by pointing out that even the Metropolitan Police Department requires urinalysis only upon reasonable suspicion of use of drugs or at the particularized direction of a member of the Board of Police and Fire Surgeons. *See Turner v. Fraternal Order of Police,* 500 A.2d 1005, 1006 (D.C.Ct.App.1985). City employees in Georgia who were handling high voltage electricity were only subjected to urine testing after an undercover officer observed each individual tested to be smoking what appeared to the officer to be marihuana. *Allen, supra,* 601 F.Supp. at 484. Moreover, even the decision approving mandatory testing of bus drivers in Illinois applied only to those who had been involved in serious accidents or "suspected of being under the influence while on duty." *Division 241, supra,* 538 F.2d at 1266, 1267.

■ There is strong authority for the proposition that taking a person's urine and testing it for drugs is a search. *Division 241, supra; Allen, supra; Turner, supra.*[4] The ultimate question here is whether plaintiff, serving as a bus attendant assisting students, particularly handicapped ones in traveling by bus to and from school had a reasonable expectation of privacy from a search by mandatory urine testing for drugs and whether any such expectation is outweighed by public safety consideration. School bus drivers or mechanics directly responsible for the operation and maintenance of school buses might reasonably expect to be subject to urine and blood tests not required of other bus drivers without particularized suspicion. *Compare Division 241, supra.* While the question is not free from doubt, particularly in light of

---

**4.** *But see* Judge Nebeker's concurring opinion in *Turner* questioning whether Fourth Amendment

concerns are even implicated in urine testing cases.

*Blackie's, supra,* it does not follow that a school bus *attendant* like plaintiff should have expected to be exposed to such testing or that public safety considerations require testing of a school bus attendant like plaintiff equivalent to that imposed by the military and more stringent than that so far found permissible for the police or for bus drivers in the absence of particularized probable cause. Accordingly, plaintiff's motion for a summary judgment that testing of her violated rights guaranteed by the Fourth Amendment must be granted.