NATIONAL TREASURY EMPLOYEES
UNION and Argent Acosta

v.

William VON RAAB, Commissioner,
United States Customs Service.

Civ. A. No. 86–3522.

United States District Court,
E.D. Louisiana.

Nov. 14, 1986.

ROBERT F. COLLINS, District Judge.

The Court is presented with a Motion by the defendant to Dismiss this action on the grounds that: (1) venue does not lie in this District; (2) plaintiffs lack standing to bring this action; (3) this Court lacks jurisdiction over this dispute; and (4) plaintiffs have failed to state a claim upon which relief may be granted. Plaintiffs oppose the Motion to Dismiss and have moved for preliminary injunctive relief. With the concurrence of all parties, pursuant to Rule 65(a)(2), the Court has consolidated hearing on the Motion for Preliminary Injunctive Relief with Trial on the Merits. The parties filed numerous exhibits into the record, but did not call any live witnesses. The parties agreed that no contested facts were presented. Accordingly, the Court makes its findings based upon the uncontroverted facts and exhibits filed into the record.

For reasons set forth below, the Court finds that venue is proper in the Eastern District of Louisiana, that the plaintiffs have standing to bring this action, that jurisdiction is properly vested in federal district court, and that plaintiffs have stated a valid claim for relief. The Court finds that the drug testing plan at issue violates numerous provisions of the United States Constitution and must be enjoined and declared unconstitutional. Accordingly, the Motion to Dismiss is DENIED, and the Petition for Injunctive and Declaratory Relief is GRANTED.

## The Drug Testing Plan

This action has been brought in federal district court seeking an injunction to block the United States Customs Service from further urine collection and analysis as a part of a "drug-testing" program implemented on July 21, 1986. The drug testing plan requires that United States Customs Service workers who seek promotion into certain enumerated "covered positions" submit to drug screening through analysis of their urine. "Drug screening through urinalysis is a condition of employment for placement into positions covered by the program." Customs Directive on Drug Screening Program, Plaintiffs' Exhibit No. 1 at 1. Customs employees who test positive through drug screening "are subject to loss of consideration for the position applied for ... [and] ... are subject to removal from the service." Plaintiffs' Exhibit No. 1 at 11. Any tentative selectee for the promotion who refuses to undergo drug screening "will lose consideration for that position." Plaintiffs' Exhibit No. 1 at 11. Urine samples are tested by using immunoassay as well as gas chromatography/mass spectrometry techniques. Plaintiffs' Exhibit No. 1 at 3. A collector is actually physically present in the lavatory during the urination process, though observation is supposed to be "close but not 'direct.'" Plaintiffs' Exhibit No. 1 at 6. One Customs worker who has already been tested described the procedure as follows: "The laboratory representative accompanied each of us into the restroom, one by one. He placed some dye into the urinal and then stepped behind a partition. The representative was able to observe me from my shoulders up from behind the partition while I urinated into the sample jar." Affidavit of Lee Cruz, Plaintiffs' Exhibit No. 5 at 3. Prior to voiding into the sample jar, subjects are required to fill out a pre-test form stating medications taken within the last thirty days and any circumstances in which the subject may have been in contact with illegal substances over the last thirty days. Plaintiffs' Exhibit No. 1 at 5.

Having discussed the drug testing plan at issue, the Court will now focus on defendant's Motion to Dismiss.

## Venue Lies In The Eastern District Of Louisiana

■ Venue is proper in the Eastern District of Louisiana. Under Title 28 United States Code section 1391(e), "A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity ... may, except as otherwise provided by law, be brought in any judicial district in which ... (2) the cause of action arose, or ... (4) the plaintiff resides if no real property is involved in the action." Both subsections support venue in this District. The Fifth Circuit has held that a cause of action can arise in several forums for purposes of venue, and that "the court should not oppose the plaintiff's choice of venue if the activities that transpired in the district where suit is brought were not insubstantial and the forum is a convenient one, balancing the equities and fairness to each party." *Florida Nursing Home Association v. Page*, 616 F.2d 1355, 1361 (5th Cir.), *cert. denied* (as to venue issue), 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980), *rev'd on other grounds*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). The Customs Service houses its headquarters for the entire South Central Region in New Orleans. Hundreds of Customs employees are located in the Eastern District of Louisiana. Employees from this District will be required to take drug tests here to receive promotions to covered positions. Activities that will transpire in this District where the suit has been brought are not insubstantial. The Court rejects defendant's restrictive notion that the only forum in which the drug testing plan may be challenged is Washington, D.C. While the Customs Directive may have been conceived and drafted in Washington, D.C., the great bulk of Customs employees who are subject to the program are outside of Washington, D.C. and will be tested outside of Washington, D.C. Activities in the Eastern District of

Louisiana contemplated under the drug testing plan are substantial.

The defendant has failed to cite a single factor that makes this an inconvenient forum. The United States has attorneys all over the country, including the Eastern District of Louisiana. While Customs is disappointed that plaintiff, National Treasury Employees Union (NTEU), exercised its unqualified right under Federal Rule of Civil Procedure 41(a)(1)(i) to voluntarily dismiss an earlier action it brought in the District of Columbia before answer was filed, Customs could have prevented this by filing an answer before the NTEU had an opportunity to voluntarily dismiss. By choosing to exercise its right under Fed.R. Civ.P. 12(a) to delay as long as 60 days before answering, the defendant lost an opportunity to prevent a voluntary dismissal of plaintiff NTEU's action brought in Washington, D.C. Having chosen to delay the filing of an answer, the defendant cannot now complain that plaintiff exercised its right to voluntarily dismiss in Washington, D.C. before issue was joined, and to refile in the Eastern District of Louisiana.

█ Venue also lies in the Eastern District of Louisiana under Title 28 United States Code section 1391(e)(4) because "the plaintiff resides" in this District. There are two plaintiffs in this action: the National Treasury Employees Union and Argent Acosta. Plaintiff Argent Acosta, President of NTEU Local 168 (which has its office in New Orleans) is a resident of this District, as are most of the employees he represents in this action. Moreover, at least one court has held that a labor organization "resides" wherever its individual members are for purposes of Section 1391(e)(4). *Columbia Power Trades Council v. U.S. Department of Energy*, 496 F.Supp. 186, 189 (W.D.Wash.1980), *rev'd on other grounds*, 671 F.2d 325 (9th Cir.1982). Finally, even if NTEU proper did not "reside" in this District, numerous courts that have considered the issue have concluded that Section 1391(e)(4) does not require *all* the plaintiffs to reside in the forum, but only one. Section 1391(e)(4)

permits an action to be brought against the federal government by plaintiffs from more than one district, in any district in which at least one of the plaintiffs resides. *Exxon Corporation v. FTC*, 588 F.2d 895, 898–99 (3d Cir.1978); *Santa Fe International Corp. v. Watt*, 580 F.Supp. 27, 29 & n. 4 (D.Del.1984); *Dow Chemical v. Consumer Product Safety Commission*, 459 F.Supp. 378, 384, n. 4 (W.D.La.1978). The Court concludes that venue lies in the Eastern District of Louisiana under both Sections 1391(e)(2) and (e)(4) of Title 28 United States Code.

### The National Treasury Employees Union Has Standing To Bring This Action

█ In its brief in support of its Motion to Dismiss, the defendant contended that the NTEU lacked standing to bring the instant lawsuit on behalf of its members. Although the defendant conceded the standing issue at oral arguments, the Court addresses it nevertheless.

A very recent Opinion of the United States Supreme Court compels the finding that the NTEU has standing to bring this action. *International Union, United Automobile Aerospace, and Agricultural Implement Workers of America v. Brock*, —— U.S. ——, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), held that a union whose members claimed that they were eligible for benefits under the 1974 Trade Act has standing to bring a federal court lawsuit on behalf of the members challenging the secretary's interpretation. The Supreme Court applied the three-part test from *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *Hunt* held that an association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. In the instant litigation, indi-

vidual NTEU members would otherwise have standing to sue in their own right. The interests the NTEU seeks to protect are germane to the organization's purpose, namely, protecting union members from degradation, harm, humiliation and loss of promotions or jobs. Neither the claim asserted by the NTEU, that the drug testing plan violates constitutional protections, nor the type relief requested, a permanent injunction, requires the participation of individual members in the lawsuit. Applying *Brock* and *Hunt* to the facts of this case, the Court concludes that the NTEU has standing to object to the drug testing program.

### The Court Has Jurisdiction Over This Dispute

■ The defendant's next argument in favor of dismissal is that this Court lacks jurisdiction to entertain this dispute. Defendant contends that this action must be resolved according to the Civil Service Reform Act (CSRA), which precludes district court jurisdiction over federal labor relations disputes.

According to the defendant, the testing program constitutes a new "condition of employment." It is the defendant's position that the plaintiffs must, therefore, attempt to characterize the program as a "negotiable" employment practice with the Federal Labor Relations Authority (FLRA), and raise their labor practice challenges to the program before that administrative tribunal. The defendant contends that plaintiffs' constitutional challenges to the program will eventually receive Article III review because the plaintiffs are entitled to appeal any final FLRA decision to the appropriate Circuit Court of Appeals.

In addition to establishing the FLRA framework for resolving labor relations disputes, the defendant argues that the CSRA sets out the exclusive comprehensive process for resolving personnel claims of federal employees in the Merit Service Protection Board (MSPB) scheme. The defendant contends that if an employee, subjected to drug testing, is denied a pro-

motion or suffers any other "adverse action," see 5 U.S.C. § 7512, he may appeal that agency decision to the MSPB. Therefore, the defendants conclude, the MSPB alone may hear the type of personnel challenges the plaintiffs have presented to this Court in regard to the testing program.

The Court finds that the plaintiffs' claim for injunctive and declaratory relief is not cognizable under this broad administrative scheme of the CSRA, but rather is properly brought directly in federal district court.

The starting point for an analysis of the preclusive effect of the CSRA is the landmark Opinion of *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). *Bush* involved an action brought by an aerospace engineer against the director of a federal space flight center to recover for alleged defamation and an alleged retaliatory demotion. The Supreme Court held that because the engineer's claims arose out of an employment relationship that was governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States, it would be inappropriate for the Court to supplement that regulatory scheme with a new nonstatutory damages remedy. The defendant to the instant litigation contends that *Bush v. Lucas* requires dismissal for lack of jurisdiction. This Court disagrees. A close reading of *Bush* reveals that this Court has jurisdiction to grant the relief requested.

The critical language in *Bush* is as follows:

"Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial—by which improper action may be redressed. They apply to a multitude of personnel decisions that are made daily by federal agencies.[28]

---

[28] Not all personnel actions are covered by this system. For example, there are no provisions for appeal of either suspensions for 14 days or less, 5 U.S.C. § 7503 (1982 ed), or adverse actions against probationary employ-

ees, § 7511. *In addition, certain actions by supervisors against federal employees, such as wiretapping, warrantless searches, or uncompensated takings, would not be defined as 'personnel actions' within the statutory scheme."* *Bush v. Lucas*, 103 S.Ct. at 2415 (emphasis added).

It is evident that warrantless searches do not constitute "personnel actions" within the statutory scheme into which defendant seeks to relegate NTEU. As discussed *infra*, this Court finds that examination of Customs workers' urine constitutes a warrantless search. Therefore, a claim for injunctive relief to block urinalysis is not covered under the CSRA. Accordingly, this Court is not deprived of jurisdiction by virtue of the CSRA.

The Court is unimpressed with defendant's attempt to distinguish footnote 28 of *Bush* as being limited to actions by "supervisors." Defendant's logic would lead this Court to the absurd result that an aggrieved Customs worker could sue his immediate supervisor for a warrantless search, but could not sue the ultimate supervisor, Commissioner Von Raab. It would be pointless to require plaintiffs to amend their suit to name each individual supervisor that would be in charge of drug testing at each location across the country. It is much more rational and judicially economical to name the head of the agency as the party defendant. Moreover, footnote 28 discussed actions by "supervisors" because *Bush v. Lucas* involved a suit by a federal employee against his supervisor. The Court rejects defendant's contention that footnote 28 is somehow limited to *ultra vires* actions by supervisors. Nothing in the footnote supports such a tortured reading, and this Court refuses to so limit the scope of footnote 28.

Aside from *Bush*, defendant relies primarily upon *National Federation of Federal Employees, et al. v. Weinberger, et al.*, 640 F.Supp. 642 (D.D.C.1986) (hereinafter referred to as *NFFE*). In that case, Judge Hogan granted a motion to dismiss a claim that challenged drug testing procedures employed by the military. Although Judge Hogan placed great weight on the language in *Bush* discussed *supra*, he failed to discuss the critical *Bush* footnote 28. The rationale of *NFFE* is completely undercut by *Bush* footnote 28. Since warrantless searches are not personnel actions within the statutory scheme, the preclusive effect of the CSRA does not operate to deprive plaintiffs of the right to seek injunctive relief in federal district court. This Court is unpersuaded by the *NFFE* decision, since that case ignores a crucial point of law raised in *Bush v. Lucas*.

Another reason why *Bush* and its progeny do not persuade this Court that it lacks jurisdiction is because plaintiffs to the instant litigation do not seek creation of a new judicial remedy, as was the case in *Bush*. As Justice Stevens pointed out in *Bush*: "Petitioner asks us to authorize a new nonstatutory damages remedy for federal employees whose First Amendment rights are violated by their superiors." 103 S.Ct. at 2406. Here, plaintiffs seek to invoke this Court's historic equitable powers to enjoin the defendant from engaging in unconstitutional activity. Plaintiffs are not seeking damages for drug tests that have already taken place. This Court does not now rule on the issue of whether it would have jurisdiction to entertain a suit for damages sustained as a result of Customs' drug screening plan. This Court merely holds that it has jurisdiction to grant equitable relief to Customs workers seeking to enjoin an unconstitutional program of warrantless searches.

It would be absurd for this Court to hold that plaintiffs must submit to unconstitutional programs established by the defendant, then seek damages under the CSRA. The more sensible approach is to enjoin the activity in the first place. Indeed, persons who test negative for drugs will have little likelihood of success in the CSRA framework since Customs would not take adverse action against such employees upon a negative test result. Yet, the employees would have been subjected to an unconstitutional search. This issue is discussed in the *NFFE* decision:

With respect to the MSPB procedures at issue, if an individual Aberdeen employee either refuses to be tested or tests positively for drug use in both field and confirmation tests, and the Army takes 'adverse action' against him as that term is used in the CSRA, he may raise constitutional and statutory challenges to the testing program in MSPB proceedings. See 5 U.S.C. § 7703(B)(1) ...

If agency action is taken against a civilian employee that cannot be characterized within the framework of the CSRA as 'adverse,' so that the employee does not have an available avenue of relief to the MSPB, it appears that nothing would prevent the employee from bringing a Bivens-type action against the individuals who ordered or supervised his drug testing: in short, 'effective remediation' for alleged constitutional deprivations could not 'conceivably' be achieved through the administrative process. *Daly*, 661 F.2d at 963.

*NFFE*, 640 F.Supp. at 654.

Under the *NFFE* approach, the district court should decline to entertain complaints for injunctive relief to prevent a constitutional violation, but should exercise jurisdiction over certain claims seeking damages for the constitutional violations. This approach is irrational. Rather than forcing the plaintiffs to submit to an unconstitutional program then seek damages in court, this Court will exercise jurisdiction over the Petition for Declaratory and Injunctive Relief.

Turning to the merits of the Petition for Declaratory and Injunctive Relief, the Court finds numerous constitutional infirmities that compel this Court to grant the injunctive and declaratory relief requested.

### The Drug Testing Plan Violates The Fourth Amendment

■ Testing of Customs workers' urine pursuant to the Customs Directive constitutes a full-blown search within the meaning of the Fourth Amendment to the United States Constitution. *See Capua v. City of Plainfield*, 643 F.Supp. 1507 (1986);

*Jones v. McKenzie*, 628 F.Supp. 1500 (D.D.C.1986); *McDonell v. Hunter*, 612 F.Supp. 1122 (D.C.Iowa 1985). Drug testing of Customs workers' bodily wastes is even more intrusive than a search of a home. When analyzing urine specimens, the defendant is searching for evidence of illicit drug usage. The drug testing plan is no minor frisk or pat-down. It is rather a full-scale search that triggers application of Fourth Amendment protections.

The mandatory collecting of urine samples pursuant to the drug testing plan constitutes a seizure within the meaning of the Fourth Amendment. *McDonell v. Hunter*, 612 F.Supp. 1122 (D.C.Iowa 1985). Indeed, the urine is seized from the Customs workers in that they must hand over a jar of their bodily wastes for analysis by the defendant.

Even *Schmerber v. State of California*, 384 U.S. 757, 86 S.Ct. 853, 16 L.Ed.2d 908 (1966), cited by defendant and discussed *infra* in connection with violations of the Fifth Amendment, held that blood testing for the presence of alcohol "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment." 86 S.Ct. at 1834. The Supreme Court noted that the Fourth Amendment "expressly provides that '[t]he right of the people to be secure in their *persons,* houses, papers, and effects, against unreasonable searches shall not be violated ...'" (emphasis in text of *Schmerber*). *Id.* The Supreme Court went on to hold that "it could not reasonably be argued ... that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of 'persons' and depend antecedently upon seizures of 'persons' within the meaning of that Amendment." *Id.* This Court rejects defendant's contention that urinalysis does not involve search and seizure within the meaning of the Fourth Amendment. Quite to the contrary, the Court finds that the drug testing plan falls squarely within the ambit of the Fourth Amendment. Testing

of urine, like the testing of blood, is a full-blown search and seizure.

Under the Customs Directive at issue, the searches and seizures are to be made in the total absence of probable cause or even reasonable suspicion. The plan does not call simply for the testing of those whom the defendant reasonably suspects of using or selling drugs at the work site. Rather, the plan uses a dragnet approach of testing all workers who seek promotion into so-called "covered positions." This dragnet approach, a large-scale program of searches and seizures made without probable cause or even reasonable suspicion, is repugnant to the United States Constitution. In weighing the massive intrusive effect of the drug testing plan against the legitimate governmental interest in a drug-free work place and work force, the Court finds the plan to be overly intrusive and constitutionally infirm. While the goal is legitimate, the means selected by the defendant violate the protections of the Fourth Amendment.

Customs workers have a reasonable expectation of privacy in their urine. *See Capua v. City of Plainfield*, 643 F.Supp. 1507 (1986); *Patchogue-Medford Congress of Teachers v. Board of Education*, 119 A.D.2d 35, 505 N.Y.S.2d 888 (1986); *Caruso v. Ward*, 506 N.Y.S.2d 789 (1986). Urination is usually conducted in private, and persons do not normally urinate in public. Indeed, under many municipal ordinances, urination in public is unlawful. Customs workers do not lose an expectation of privacy in their urine merely by reporting to work at a work site supervised by the defendant. The Court notes that excreting body fluids and body wastes is one of the most personal and private human functions. While body fluids and body wastes are normally disposed of by flushing them down a toilet, Customs workers do maintain a legitimate expectation of privacy in their urine until the decision is made to flush the urine down the toilet and the urine is actually flushed down the toilet. The Customs Directive violates a legitimate expectation of privacy held by Customs workers.

This Court agrees with Judge Vietor's analysis in *McDonell v. Hunter*, 612 F.Supp. 1122 (D.C.Iowa 1985):

> Urine, unlike blood, is routinely discharged from the body, so no governmental intrusion into the body is required to seize urine. However, urine is discharged and disposed of under circumstances where the person certainly has a reasonable and legitimate expectation of privacy. One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds, except as part of a medical examination. It is significant that both blood and urine can be analyzed in a medical laboratory to discover numerous physiological facts about the person from whom it came, including but hardly limited to recent ingestion of alcohol or drugs. One clearly has a reasonable and legitimate expectation of privacy in such personal information contained in his body fluids.

*McDonell*, 612 F.Supp. at 1127. *See also, Jones v. McKenzie*, 628 F.Supp. 1500, 1508 (D.D.C.1986) (finding a reasonable expectation of privacy from a search of mandatory urine testing for drugs).

The Court concludes that the drug testing plan constitutes an overly intrusive policy of searches and seizures without probable cause or reasonable suspicion, in violation of legitimate expectations of privacy. The searches and seizures are unreasonable and wholly unconstitutional.

### It Is Unconstitutional To Condition Public Employment On "Consent" To An Unreasonable Search

The Court rejects defendant's contention that Customs workers who are compelled to submit to urinalysis as a precondition to advancement into so-called "covered positions" have voluntarily waived their constitutional rights. Quite to the contrary, the Court finds that Customs workers who submit to the plan do not and have not done so voluntarily, but give and have

given consent as a result of "coercion, express or implied" within the meaning of *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ The Court holds that it is unconstitutional for the government to condition public employment on "consent" to an unreasonable search. The Court refuses to find voluntary "consent" to an unreasonable search where the price of not consenting is loss of government employment or some other government benefit.

This holding, that consent coerced from Customs workers is involuntary, is consistent with the Opinion of the Fifth Circuit in *Thorne v. Jones,* 765 F.2d 1270 (5th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1198, 89 L.Ed.2d 313 (1986). In that case, a visitor to a prison was obliged to sign a visitor form as a precondition to visiting his two inmate sons. The form purported to waive Fourth Amendment rights. After being subjected to a strip search, the father brought an action challenging the search. The Fifth Circuit held that the trial court did not err in rejecting the Louisiana State Penitentiary's "consent" defense. Following the Fifth Circuit's guidance, this Court holds that purported consent to urinalysis by Customs workers is involuntary and is the result of coercion.

### The Drug Testing Plan Violates The Self-Incrimination Clause Of The Fifth Amendment

■ The Court finds that the drug testing plan would violate the Fifth Amendment protections against self-incrimination. Customs workers who seek promotions are forced to provide bodily excrements to enable the defendant to seek evidence of any illicit drugs the workers may have taken. Additionally, Customs workers are required to fill out a pre-test form stating which medications were taken within the last thirty days and any circumstances where the subject may have been in contact with illegal substances in the last thirty days. This constitutes involuntary self-incrimination which is forbidden under the Fifth Amendment to the United States Constitution.

The Court is cognizant that *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) held that the privilege against self-incrimination protects an accused only from being compelled to testify against himself, or to provide "evidence of a testimonial or communicative nature." 384 U.S. at 761, 86 S.Ct. at 1830. The withdrawal of blood in *Schmerber* was held not to involve compulsion to those ends. *Schmerber,* however, is distinguishable from the instant case on numerous grounds. In *Schmerber,* the Supreme Court found that "there was plainly probable cause" to arrest and to charge the defendant, whereas in the instant case the defendant conducts the searches and seizures in the absence of probable cause. The Customs Directive applies to workers who have given no reason to believe they are using drugs and who have furnished no probable cause to justify arrest. Moreover, *Schmerber* involved only the taking of a blood sample, whereas the Customs Directive requires both a urine sample *and* a pre-test form stating medications taken and any circumstances in which the subject may have been in contact with illegal substances. Taken as a whole then, the Customs Directive calls for "evidence of a testimonial or communicative nature." Finally, *Schmerber* involved the mere drawing and testing of a blood sample, a procedure that in no way detracts from human dignity and self respect. The Customs Directive, on the other hand, requires the presence of an observer in the restroom while a subject performs excretory functions. The observer listens to the bodily fluids being expelled and witnesses the voiding process closely but not directly. This gross invasion of privacy constitutes a degrading procedure that so detracts from human dignity and self respect that it "shocks the conscience" and offends this Court's sense of justice. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The Court concludes that the Customs Directive violates the self-incrimination clause of the Fifth Amendment.

## The Drug Testing Plan Violates Penumbral Rights Privacy Guaranteed By The United States Constitution

█ The Court finds that the Customs Directive unconstitutionally interferes with the penumbral rights of privacy held by Customs workers. In *Griswold v. State of Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court held that "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance ... These cases bear witness that the right of privacy ... is a legitimate one ... The present case, then, concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees." *Griswold*, 85 S.Ct. at 1681–82. The constitutional right of personal privacy was reiterated by the Supreme Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There the Court stated: "In a line of decisions ... going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe*, 93 S.Ct. at 726.

The Court finds that the Customs Directive detracts from the dignity of each Customs worker covered under the plan and invades the right of privacy such workers have under the United States Constitution. Excreting bodily wastes is a very personal bodily function normally done in private; it is accompanied by a legitimate expectation of privacy in both the process and the product. The Customs Directive unconstitutionally interferes with the privacy rights of the Customs workers.

## The Drug Testing Plan Is So Unreliable As To Violate Due Process Of Law

█ The Court finds that the drug testing plan is far from an infallible system. Indeed, the affidavit of a Customs worker who has already been tested, Benito D. Juarez, states that the laboratory representative mixed up his sample with that of another Customs worker:

> "After I urinated, I noticed that the laboratory representative was affixing a sticker to my sample bottle. The sticker he was affixing had the wrong social security number on it. He had already filled out the labels before collecting our samples, and apparently he placed Fred Robinson's sticker on my bottle. When I alerted him to his mistake, he went back and checked his papers to determine my social security number and then corrected his error."

Affidavit of Benito D. Juarez, Plaintiffs' Exhibit No. 6 at 3.

The entire process is fraught with the danger of mishaps and false-positive readings. The Affidavit of Dr. Arthur J. McBay, a toxicologist with a Ph.D. in Pharmaceutical Chemistry, describes the dangers:

> The EMIT screen suffers from limitations in its reliability. This test will give a positive result for the tested drug when other prescription and over the counter drugs have been ingested, and may react to food and other substances, including enzymes produced by the body itself. This is because of a phenomonon known as 'cross-reactivity.' The legitimate drugs that have triggered a positive result for marijuana, for example, include the anti-inflammatory drugs ibuprofen, fenoprofen, and naproxen, some of the most widely used drugs in this country. They are sold under the brand names Advil, Motrin, Nuprin, Rufen, Anaprox, Aponaproxen, Naprosyn, Navaonaprox and Nalfon. A number of drugs that are closely related in chemical structure to amphetamines will also test positive, mainly diet and cold preparations containing ephedrine and phenylpropanolamine. These include Nyquil, Contac and other brand names. In addition, the immunoassay tests cannot distinguish between codeine, a legal drug, and heroin. Both are classified opiates.

I am also familiar with the Gas Chromatography/Mass Spectrometry method of urinalysis testing. If conducted properly, the combination of gas chromatography with mass spectrometry can provide a more reliable test for determining the presence of drugs in a urine sample, because it identifies the specific metabolites in urine samples. Positive identification, however, requires strict handling safeguards and procedures which insure that the samples are not exposed to excessive temperatures through the transportation process. The GC/MS test is significantly more expensive to conduct ...

All drug testing procedures result in false positives. The reliability of all drug determinations, whether by immunoassay or GC/MS, depend on such factors as the certainty of specimen identification; specimen storage, handling, and preparation; preparation and storage of test reagents; proper cleaning and calibration of testing instruments and hardware; and the qualification and training of laboratory personnel performing the test and interpreting the results. The danger of carelessness in test performance and/or inadequately trained personnel may be a particular problem with immunoassays, which are popular for low-cost, large-scale screening of many specimens with readily available equipment and minimum personnel training. The problem nonetheless is also present when GC/MS is utilized.

Affidavit of Dr. Arthur J. McBay, Plaintiffs' Exhibit No. 8 at 3–4.

The Court concludes that the drug testing program is so fraught with dangers of false positive readings as to deny the Customs workers due process of law when they apply for promotion into covered positions. Furthermore, in balancing the legitimate law enforcement, societal and governmental interests of the defendant against the severity of the intrusiveness, the unreliability of the testing further convinces the Court that the drug testing plan is unreasonable and not rationally related to achievement of the governmental interest.

### The Defendant Has Failed To Show That A Legitimate Governmental Interest Has Been Threatened

That the drug testing plan is not rationally related to the achievement of a legitimate governmental interest is highlighted by the conspicuous absence of any statistics by the defendant showing any drug problem whatsoever among federal workers. Indeed, in a United States Government Memorandum from the Commissioner of Customs to all Customs Employees, dated March 13, 1986, the Commissioner stated, "I believe that Customs is largely drug-free ..." Plaintiffs' Exhibit No. 2 at 1. Since Customs has not demonstrated a drug problem among its work force, the drug testing plan is an overly intrusive scheme that bears no rational relationship to the protection of an endangered governmental interest. The defendant simply has not shown that a legitimate governmental interest has been threatened.

Even if it could show that its interest in a drug-free work force were threatened, the means selected to achieve that end are overly intrusive. After weighing the legitimate governmental interests of the plan against the severity of the intrusiveness, the Court concludes that the drug testing plan is unreasonable.

### Receipt Of A Federal Benefit Cannot Be Conditioned Upon Waiver Of Constitutional Rights

The Court holds that it is unconstitutional for the government to condition receipt of a federal benefit, in this case federal employment or promotion, upon the waiver of constitutional rights. If the government were permitted to compel waiver of constitutional rights in order to receive a federal promotion, there would be little stopping the government from extending the principle to require, for instance, that all those who wish to receive welfare benefits must consent to have their urine searched, or that those who wish to ride upon federal highways must consent

to have their urine searched. Essentially, the plan requires the federal Customs workers to prove their innocence. Under the United States Constitution, persons are presumed innocent until proven guilty. The Customs Directive would reverse that as to Customs workers.

As Judge Sarokin eloquently noted in *Capua, et al. v. City of Plainfield,* 643 F.Supp. 1507 (1986):

> The invidious effect of such mass, round-up urinalysis is that it casually sweeps up the innocent with the guilty and willingly sacrifices each individual's Fourth Amendment rights in the name of some larger public interest. The City of Plainfield essentially presumed the guilt of each person tested. The burden was shifted onto each fire fighter to submit to a highly intrusive urine test in order to vindicate his or her innocence. Such an unfounded presumption of guilt is contrary to the protections against arbitrary and intrusive government interference set forth in the Constitution ...

*Capua,* 643 F.Supp. at 1517.

It is up to the government to obtain evidence in a constitutionally permissive manner against those who are suspected of illicit drug usage. If the government has probable cause to suspect a particular Customs worker is using or selling illicit drugs on the job, a warrant should be obtained in a court of law.

### *The Drug Testing Plan Is Utterly Repugnant To The United States Constitution*

The plan put forth in the Customs Directive is so utterly repugnant to the United States Constitution, that this Court has no choice but to permanently enjoin Commissioner William Von Raab from further implementing it.

WHEREFORE, the Petition for Injunctive and Declaratory Relief is GRANTED. The Motion to Dismiss is DENIED. The defendant is ENJOINED from conducting urinalysis drug testing in the absence of probable cause. The Court GRANTS a DECLARATORY JUDGMENT declaring the drug testing program to be unconstitutional.